**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| **AARON TOBEY**, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )     **Civil Action No.  3:11cv154-HEH** |
| | ) |
| **JANET NAPOLITANO**, *et al.* | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

## PLAINTIFF'S OPPOSITION AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

James J. Knicely (VSB #19356)
Robert Luther III (VSB #78766)
KNICELY & ASSOCIATES, P. C.
487 McLaws Circle, Suite 2
Williamsburg, Virginia 23185
(757) 253-0026 (phone)
(757) 253-5825 (fax)
jjk@knicelylaw.com

Anand Agneshwar
Alan C. Veronick
ARNOLD & PORTER, LLP
399 Park Avenue
New York, New York 10022-4690
(212) 715-1000 (phone)
(212) 212-715.1399 (fax)
anand.agneshwar@aporter.com

*Of Counsel*:
John W. Whitehead (VSB # 20361)
Douglas R. McKusick (VSB # 72201)
The Rutherford Institute
1440 Sachem Place
Charlottesville, Virginia 22906
Participating Attorneys for
THE RUTHERFORD INSTITUTE

*Attorneys for Plaintiff, AARON TOBEY*

Dated:  July 11, 2011

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..........................................................................................1

FACTUAL ALLEGATIONS ...........................................................................................2

STANDARD OF REVIEW .............................................................................................7

ARGUMENT ..................................................................................................................8

I.      PLAINTIFF'S CLAIM UNDER 42 U.S.C. § 1983 SHOULD NOT BE
        DISMISSED FOR FAILURE TO STATE A CLAIM .........................................11

II.     THE DOCTRINE OF QUALIFIED IMMUNITY DOES NOT BAR
        PLAINTIFF'S PERSONAL LIABILITY FOR CONSTITUTIONAL
        CLAIMS AGAINST THE INDIVIDUAL FEDERAL DEFENDANTS ..............12

    A.  Plaintiff's Amended Complaint Alleges a Clearly Established
        Fourth Amendment Violation............................................................... 17

    B.  Plaintiff's Amended Complaint Alleges a Clearly Established First
        Amendment Violation.......................................................................... 20

    C.  Plaintiff's Amended Complaint Alleges a Clearly Established Fifth
        Amendment Violation.......................................................................... 24

    D.  Should the Court Conclude that the Controlling Law Is Not Clearly
        Established, the Federal Defendant's Motion Must Still Be Denied
        Because It Is Premature to Decide the Qualified Immunity Question.................. 26

    CONCLUSION........................................................................................................

# TABLE OF AUTHORITIES

## CASES                                                                 PAGE(S)

*Anderson v. Cornejo,*
    284 F. Supp. 2d 1008 (N.D. Ill. 2003) .........................................................21

*Baribeau v. City of Minneapolis,*
    596 F.3d 465 (8th Cir. 2010) .....................................................................17

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007).................................................................................7,8

*Billings v. U.S.,*
    57 F.3d 797 (9th Cir. 1995) .........................................................................9

*Board of Airport Comm'rs v Jews for Jesus,*
    482 U.S. 569 (1987)...................................................................................17

*Buffkins v. City of Omaha,*
    922 F.2d 465 (8th Cir. 1991) .....................................................................16

*Burgess v. Lowery,*
    201 F.3d 942 (7th Cir.2000) ......................................................................12

*Case v. Milewski,*
    327 F.3d 564 (7th Cir. 2003) .......................................................................9

*Cohen v. California,*
    403 U.S. 15 (1971)....................................................................................18

*Curley v. Klem,*
    298 F.3d 271 (3d Cir. 2002)........................................................................24

*Doe v. S.C. Dep't. of Social Servs.,*
    597 F.3d 163 (4th Cir. 2010) ......................................................................11

*Edwards v. City of Goldsboro,*
    178 F.3d 231 (4th Cir. 1999) ........................................................................8

*Florida v. Royer,*
    460 U.S. 491 (1983)...................................................................................15

*Fortney v. Mullins,*
    2011 WL 1885402 (N.D.W.Va. April 6, 2011) ..........................................25

*Grant v. City of Pittsburgh,*
  98 F.3d 116 (3d Cir. 1996)......................................................................25

*Hampton v. Hanrahan,*
  600 F. 2d 600 (7th Cir. 1979), *rev'd on other grounds,*
  446 U.S. 754 (1980).................................................................................9

*Harden v. Montgomery County,*
  2010 WL 3938326 (D. Md. Oct. 6, 2010) ...........................................26

*Harlow v. Fitzgerald,*
  457 U.S. 800 (1982)......................................................................7,11,12

*Henry v. Purnell,*
  619 F.3d 323 (4th Cir. 2010) ..............................................................11

*Hope v. Pelzer,*
  536 U. S. 730 (2002).............................................................................12

*Jackson v. Statler Found.,*
  496 F.2d 623 (2d Cir. 1973)...................................................................9

*Kletschka v. Driver,*
  411 F.2d 436 (2d Cir. 1969)...................................................................9

*Knox v. Southwest Airlines,*
  124 F.3d 1103 (9th Cir. 1997) ............................................................16

*Lee v. Int'l Soc. for Krishna Consciousness, Inc.,*
  505 U.S. 830 (1992)..............................................................................18

*Maryland v. Macon,*
  472 U.S. 463 (1985)..............................................................................15

*McCall v. City of Portsmouth,*
  2007 WL 3025359 (E.D. Va. Oct. 12, 2007)..........................................8

*Melgar v. Green,*
  593F.3d 348 (4th Cir. 2010) ...............................................................12

*Morrison v. Garraghty,*
  239 F.3d 648 (4th Cir. 2001) ..............................................................20

*Multimedia Publ'g Co. of S.C., Inc. v. Greenville-Spartanburg Airport Dist.,*
  991 F.2d 154 (4th Cir. 1993) ..............................................................18

*Nordlinger v. Hahn,*
  505 U.S. 1 (1992)) ................................................................................20

*Park Shuttle N Fly, Inc. v. Norfolk Airport Auth., Norfolk Int'l Airport,*
     352 F. Supp. 2d 688 (E.D. Va. 2004) ........................................................21

*Pearson v. Callahan,*
     129 S.Ct. 808 (2009)............................................................................11

*Rendon v. TSA,*
     424 F.3d 475 (6th Cir. 2005) ........................................................... 18-19

*Republican Party of NC v. Martin,*
     980 F.2d 943 (4th Cir. 1992) ...................................................................8

*Revene v. Charles County Commissioners,*
     882 F.2d 870 (4th Cir. 1989) ...................................................................7

*Rosenberger v. Rector & Visitors,*
     515 U.S. 819 (1995)...............................................................................18

*San Antonio Indep. School Dist. v. Rodriguez,*
     411 U.S. 1 (1973)...................................................................................21

*Saucier v. Katz,*
     533 U.S. 194 (2001)...............................................................................11

*Scheuer v. Rhodes,*
     416 U.S. 232 (1974)................................................................................7

*Scinto v. Preston,*
     170 Fed. Appx. 834 (4th Cir. 2006).........................................................7

*Shelton v. Tucker,*
     364 U.S. 479 (1960)...............................................................................12

*Smith v. Reddy,*
     101 F.3d 351 (4th Cir.1996) ...................................................................16

*Swagler v. Neighoff,*
     2009 WL 1575326 (D.Md. June 2, 2009), *rev'd on other grounds,*
     398 Fed.Appx. 872 (4th Cir. 2010)...........................................................24

*Terry v. Ohio,*
     392 U.S. 1 (1968)...................................................................................16

*The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.,*
     597 F.3d 570 (4th Cir. 2010) ..................................................................18

*West v. Atkins,*
     487 U.S. 42 (1988)..................................................................................9

*U.S. v. Aukai,*
    497 F.3d 955 (9th Cir. 2007) ............................................................. 12-15

*U.S. v. Hartwell,*
    436 F.3d 174 (3d Cir. 2006).............................................................13,14

*Veney v. Wyche,*
    293 F.3d 726 (4th Cir. 2002) ...................................................................21

*Venkatraman v. REI Sys., Inc.,*
    417 F.3d 418 (4th Cir. 2005) .....................................................................8

*Village of Willowbrook v. Olech,*
    528 U.S. 562 (2000)...............................................................................20

*Willis v. Town of Marshall, N.C.,*
    426 F.3d 251 (4th Cir. 2005) ...................................................................21

## <u>STATUTES</u>                                                    <u>PAGE(S)</u>

42 U.S.C. § 1983...............................................................................7,8-10

49 U.S.C. § 114.....................................................................................10

Fed. R. Civ. Pro. 12(b)(6) ......................................................................8

49 C.F.R. 1540.109 ...........................................................................10,18

## PRELIMINARY STATEMENT

On December 30, 2010, Plaintiff Aaron Tobey, decided to peacefully protest what he perceived to be invasive enhanced airport screening procedures at Richmond International Airport ("RIC").  When asked to walk through an advanced imaging screening unit at RIC, Plaintiff removed his t-shirt and sweatpants, displaying the text of the Fourth Amendment on his chest.  The Transportation Security Administration ("TSA") agents and the Capital Region Airport Commission (the "Commission") police then humiliated and punished him in direct retaliation for this protected act of peaceful protest, detaining and arresting him without probable cause, repeatedly searching his belongings, seizing and discarding certain of his personal effects, and charging him with a trumped up, meritless charge of disorderly conduct, which the prosecutor subsequently dismissed.  With this lawsuit Plaintiff seeks to vindicate his First, Fourth, and Fourteenth Amendment rights.

In moving to dismiss Plaintiff's claims, the Federal Defendants'[1] argue "that there is no right or wrong way to handle a specific issue as it arises during the security screening process," whether it be with  regard to the nature of the conduct giving rise to the issue, the constitutional protection afforded the conduct, or the reasonableness of the response.  Fed. Def. Br. 17 (relying on TSA Management Directive No. 100.4, at 6).  Under such a theory, the TSA conceivably could ignore the specific limitations set forth in its own Directive, and applicable constitutional standards, with absolute immunity

---

[1] The "Federal Defendants" include Janet Napolitano, sued in her official capacity as the Secretary of Homeland Security, John Pistole, sued in his official capacity as the Administrator of the TSA, Rebecca Smith, a Transportation Security Officer sued in both her official capacity and individually, and Terri Jones, a Supervisory Transportation Security Officer sued in both her official capacity and individually.

from any challenge to the conduct of its agents.  Of course, that is not and never has been the law.

Perhaps recognizing the fallacy of their legal position, the Federal Defendants advance a version of the facts vastly different from those alleged in the Amended Complaint.  Contrary to what the Federal Defendants' suggest in their brief, the Amended Complaint alleges unequivocally that Plaintiff engaged in a silent, non-violent protest, always obeying the directions of TSA and RIC officials.  Nowhere in the Federal Defendants' brief do they claim that such a silent non-violent protest gives them the right to detain or cause the arrest of an individual.  Plaintiff's Amended Complaint plainly contends that the Federal Defendants, acting under the color of state law, worked hand-in-hand with the Commission Defendants to directly cause the deprivation of Plaintiff's First, Fourth and Fifth Amendment rights.  Accordingly, the Federal Defendants' motion to dismiss should be denied.[2]

## **FACTUAL ALLEGATIONS**

The TSA is the government agency charged and empowered by law to maintain and monitor the security of commercial travel in the United States.  Am. Compl. ¶ 13. Defendant Janet Napolitano is Secretary of the Department of Homeland Security of which the TSA is a division and/or sub-department.  *Id.* ¶ 5.  She has authority over TSA's programs, policies, practices, procedures, customs and protocols for conducting security screening at airports located in the United States, and is responsible for ensuring compliance by TSA with applicable law.  *Id.*  Defendant John Pistole is Administrator of TSA, reporting to Defendant Napolitano.  *Id.* ¶ 6.  He is directly responsible for the

---

[2] The Federal Defendants move to dismiss any claims for damages against the Federal Government based on the doctrine of sovereign immunity.  Fed. Def. Br. 6-8.  It was not Plaintiffs intention, however, to assert claims for damages against the Federal Defendants.  *See* Am. Compl., Prayer for Relief ¶ E.

administration and management of TSA's programs, policies, practices, procedures, customs and protocols for conducting security screening at airports located in the United States, for the supervision of its employees, and for ensuring compliance by TSA with applicable law. *Id.*

Defendant Rebecca Smith is a Transportation Security Officer responsible for passenger and baggage screening at the RIC airport. *Id.* ¶ 9. Defendant Terri Jones is a Supervisory Transportation Security Officer responsible for supervising Transportation Security Officers at passenger and baggage screening checkpoints, overseeing passenger and baggage security and screening operations at such checkpoints, ensuring that TSA and the Defendant Commission agreements, procedures, protocols, and security plays are implemented and followed, resolving screening and security issues at checkpoints, and interfacing with law enforcement personnel. *Id.*

TSA screens and searches airline passengers at airports, including RIC. *Id.* ¶ 14. As part of its screening activities, TSA has implemented a policy of randomly selecting passengers for enhanced secondary screening. *Id.* ¶ 15. Under TSA's enhanced secondary screening policy, passengers are offered a choice of submitting to either (a) an Advanced Imaging Technology ("AIT") scan, which produces a highly detailed picture of the passenger's unclothed body; or (b) a full-body pat-down search, which involves TSA agents using the front of their hands to feel the passenger's body. *Id.* ¶ 16.

TSA's conducts its screening activities pursuant to a policy implemented by Defendants Napolitano and Pistole known as TSA Management Directive No. 100.4. *Id.* ¶ 17. The purpose of this directive is limited: "to prevent, protect against or respond to acts of terrorism and to protect persons, facilities and critical infrastructure as part of a

layered security system in all modes of transportation," including checkpoint screening, "to find explosives, incendiaries, weapons or other items and screening to ensure that an individual[']s identity is appropriately verified and checked against government watch lists."  *Id*.  Under TSA Management Directive No. 100.4, all administrative and special needs searches conducted by TSA personnel are likewise limited "to established procedures to ensure that searches will be confined in good faith to their intended purpose," which include the objectives of enhancing "the security of persons and critical infrastructure," eliminating "the threat item(s) that are the target of the search," as well as tailoring searches "to protect personal privacy."  *Id.* ¶ 19.

The Commonwealth of Virginia has granted authority to the Commission to manage, regulate, and operate RIC.  *Id.* ¶ 7.  The Commission's responsibilities include promulgating and enforcing rules and regulations governing the activities at RIC.  *Id.* The Commission has entered into written agreements with the TSA as to jurisdiction, operations, coordination, collaboration, and cooperation in joint law enforcement activities at RIC.  *Id.* ¶¶ 7, 20, 23.  The agreements include a Memorandum of Agreement requiring TSA "[t]o provide guidance as to the process and procedures necessary to implement the Playbook Concept," and establishing a process by which TSA and the Commission "will act collaboratively for the purpose of combining layers of security and coordinating the assets of TSA, law enforcement, and other security partners at the airport to improve the overall airport security posture."  *Id.* ¶ 21.  Under the Memorandum of Agreement, the Commission has responsibility "to actively participate in the collaborative coordination of security countermeasures" and "to assign airport resources, when available and appropriate, to execute agreed upon Plays."  *Id.* ¶ 22.

These rules, procedures and protocols were in effect on December 30, 2010, when Plaintiff Aaron Tobey, a Charlottesville, Virginia resident studying architecture at the University of Cincinnati, sought to fly from RIC to attend his grandfather's funeral in Wisconsin. *Id.* ¶ 25. Contrary to the Federal Defendants' characterization, Plaintiff was not intent on protesting the TSA's security procedures under any circumstances. Fed. Def. Br. 4. He was, instead, intent on engaging in a peaceful protest if he was selected for advanced screening.

To prepare for his protest, Plaintiff wrote the text of the Fourth Amendment in black marker on his chest with the intent of removing his shirt and pants if the TSA selected him for advanced screening. Plaintiff then waited for the number of people in line to diminish before entering the area at RIC established for TSA security screening. *Id.* ¶ 27. Plaintiff entered the area for security screening and submitted his boarding pass and identification to the pre-screening agent. *Id.* ¶ 28. Upon being cleared by the pre-screening agent, Plaintiff proceeded to the conveyor belt area and as directed placed his belt, shoes, wallet, phone, computer, carry-on bag, and sweatshirt on the conveyor belt. *Id.* ¶ 29. When Plaintiff reached the passenger screening location, Defendant Smith diverted him to an AIT scanning unit. *Id.* ¶¶ 30.

The Federal Defendants claim that Plaintiff then refused Defendant Smith's instruction to proceed through the AIT scanner, attempted to opt-out of the screening procedures, and otherwise interfered with the screening process. Fed. Def. Br. 12, 14, 16-17, 19. This rendition of what happened contradicts the allegations of the Amended Complaint, which must be taken as true (and viewed in the light most favorable to Plaintiff) for purposes of this motion. In the Amended Complaint, Plaintiff alleges that

- 5 -

he simply removed his t-shirt and sweatpants and placed them on the conveyor belt before entering the AIT scanning unit.  First Amended Compl. ¶ 31.  Plaintiff stood in athletic running shorts and socks, revealing the "protest language" of the Fourth Amendment on his chest.  *Id.*  When advised that he did not need to remove his clothing, Plaintiff responded that he wished to do so to express his belief that enhanced screening procedures were unconstitutional.  *Id.* ¶ 32.  Defendant Smith then radioed for assistance without requesting Plaintiff to undergo the AIT scanning or offering a pat-down search alternative.  *Id.* ¶ 33.  At no time did Plaintiff refuse to undergo the AIT scanning or a pat-down, *id.* ¶ 65, nor did he observe any disruption of other airline passengers as a result of his peaceful protest.  *Id.* ¶ 66.  The Amended Complaint could not be clearer in alleging that Plaintiff at all times during the screening process "remained quiet, composed, polite, cooperative and complied with the requests of agents and officers."  *Id.* ¶ 65.

In response to Defendant Jones's call, Commission Defendants Vann and Mason arrived at the screening area.  *Id.* ¶ 34.  Vann, at the urging of Defendant Mason, accosted Plaintiff from behind, handcuffed him, pushed him through the AIT device, and arrested him for "creating a public disturbance."  *Id.* ¶¶ 33-35.  Vann took Plaintiff to the airport police station, located under the center of the main RIC concourse.  *Id.* ¶ 39.  There, several officers, including Vann, questioned, bullied and argued with him about his protest.  *Id.* ¶¶ 40-44, 50-53.  Plaintiff spent 90 minutes in handcuffs with arms behind his back, wearing only running shorts and socks in the cold airport police station.  *Id.* ¶ 54.  Finally the officers charged Plaintiff with disorderly conduct in a public place in violation of Virginia Code 18.2-415 and informed him that he would be released, only

after he spoke with an Air Marshal from the Federal Air Marshal's Joint Terrorism Task Force. *Id.* ¶ 55. The Officers held Plaintiff until the Air Marshal arrived. After the Air Marshal completed his investigation, Plaintiff was released. *Id.* ¶¶ 56, 63. The Commonwealth Attorney for Henrico County, Virginia subsequently dropped the charge, admitting there was no evidence to sustain it. *Id.* ¶ 75.

## STANDARD OF REVIEW

A motion to dismiss "should not be granted unless it appears beyond doubt that the plaintiff *can prove no set of facts* to support h[is] allegations." *Revene v. Charles County Commissioners*, 882 F.2d 870, 872 (4th Cir. 1989) (emphasis added) (internal citations omitted). As the United States Supreme Court explained in *Scheuer v. Rhodes*, 416 U.S. 232 (1974),

> [w]hen a federal court reviews the sufficiency of a [§ 1983] complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.

*Id.* at 236, *abrogated on other grounds by, Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 584 (2007) (affirming decision not to expand pleading requirements beyond the limits of the Federal Rules); *Scinto v. Preston*, 170 Fed. Appx. 834, 836 (4th Cir. 2006) (stating that "where the face of the pleadings tends to show that recovery would be very remote and unlikely, a complaint cannot be dismissed unless there is *no set of facts* in support of the claim which would entitle the plaintiff to relief") (emphasis added) (quoting *Scheuer*); *Revene*, 882 F.2d at 872 (quoting *Scheuer* for the proposition quoted above).

A motion to dismiss under Rule 12(b)(6) "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of NC v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).  The complaint's allegations are taken as true and all reasonable factual inferences should be construed in the plaintiff's favor.  *See McCall v. City of Portsmouth*, No. 2:07cv339, 2007 WL 3025359, *3 (E.D. Va. Oct. 12, 2007) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)); *see also Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) ("In considering a motion to dismiss, we accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff.").  Rule 12(b)(6) does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

## ARGUMENT

### I.   PLAINTIFF'S CLAIM UNDER 42 U.S.C. § 1983 SHOULD NOT BE DISMISSED FOR FAILURE TO STATE A CLAIM.

The Federal Defendants contend that they may not be held liable under 42 U.S.C. § 1983 because that provision applies only to actions taken under color of state law, which they allege was not the case here.  They argue that they "acted exclusively under federal law when implementing and administering checkpoint screening policies" and that the Commission Defendants did not exercise control over them.  Fed. Def. Br. 9-10.  Federal officials have routinely been held liable, however, under Section 1983 where they act jointly with state officials.

To state a Section 1983 claim, a plaintiff must allege: (1) the violation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation was committed by a person acting under the color of state law.  *See, e.g.,*

*West v. Atkins*, 487 U.S. 42, 48 (1988).  Federal officials act under color of state law where they act in joint cooperation and coordination with state officials to deprive an individual of his or her constitutional rights.  For example, in *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979), *rev'd on other grounds*, 446 U.S. 754 (1980), the court found that federal officials acted under color of state law when they initiated an investigation and shared information with state officials, even though the plaintiff did not allege that the federal officials acted under state control.  *Id.* at 627.   The Court ruled that "liability arises when persons 'who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt his acts done for their benefit are equally liable with him.'"  *Id.* (citation omitted); s*ee also Kletschka v. Driver*, 411 F.2d 436, 448 (2d Cir. 1969) ("We can see no reason why a joint conspiracy between federal and state officials should not carry the same consequences under § 1983 as does joint action by state officials and private persons."); *Case v. Milewski*, 327 F.3d 564, 567 (7th Cir. 2003) ("it is assumed that a § 1983 action can lie against federal employees-as it can against private individuals-if they conspire or act in concert with state officials to deprive a person of her civil rights under color of state law"); *Billings v. U.S.*, 57 F.3d 797, 801 (9th Cir. 1995) ("federal employees, like private individuals, can act under color of state law if they conspire or act in concert with state officials to deprive a person of her civil rights"); *Jackson v. Statler Found.*, 496 F.2d 623, 635 (2d Cir. 1973) (finding that Section 1983 claims apply to actions of the federal government when "there is a conspiracy between state and federal officials").

That the Amended Complaint alleges joint federal and state action and cooperation cannot seriously be disputed. The Amended Complaint alleges that the Memorandum of Agreement between the Federal Defendants and the Commission Defendants includes the parties' agreement to "act collaboratively for the purpose of combining layers of security and coordinating the assets of TSA, law enforcement, and other security partners at the [RIC] to improve the overall airport security posture." Am. Compl. ¶ 21. Under the written agreement, the law enforcement officers of the Commission are, in effect, deputized to the service of TSA to enforce TSA regulations, policies, practices, customs and/or protocols. *Id*. ¶ 20. The Commission is charged "to actively participate in the collaborative coordination of security countermeasures" and "to assign airport resources, when available and appropriate, to execute agreed upon Plays." *Id*. ¶ 22. For this law enforcement collaboration at the security screening areas of RIC, TSA provides compensation to the Commission. *Id*. ¶ 24. Finally, TSA Management Directive No. 100.4, at 2 and 6, further requires TSA screeners to report evidence of crimes to a supervisor or a "law enforcement official," which includes state or local law enforcement. Fed. Def. Br. Ex. A.

The Federal Defendants readily admit that they have established "procedures for notifying . . . appropriate State and local law enforcement officials" of individuals suspected of posing a threat to airline safety, 49 U.S.C. § 114(h)(2). Fed. Def. Br. 9. Acting pursuant to these procedures, when Plaintiff removed his t-shirt and sweatpants to reveal the Fourth Amendment written on his chest, Defendant Smith radioed Defendant Jones who called in RIC police, directly resulting in Plaintiff's subsequent arrest. Am. Compl. ¶¶ 33-35, 56, 105. The Federal Defendants acted hand-in-glove with the

Commission Defendants under established security protocols to implement and coordinate the joint TSA-Commission security screening operation at RIC, including the referral of alleged criminal activity to the RIC police.  Upon booking Plaintiff on a trumped up criminal charge, the Amended Complaint makes clear that the Commission Defendants then continued to hold Plaintiff for interrogation by the TSA Federal Air Marshal before he was released.  *Id.* ¶ 55, 60-63.  This seamless web of TSA screening protocols involving TSA agents at the front and rear end of the actions taken by the RIC police inextricably links TSA to action taken under color of state law.  Accordingly, Section 1983 liability attaches.

## II.   THE DOCTRINE OF QUALIFIED IMMUNITY DOES NOT BAR PLAINTIFF'S PERSONAL LIABILITY FOR CONSTITUTIONAL CLAIMS AGAINST THE INDIVIDUAL FEDERAL DEFENDANTS.

"The doctrine of qualified immunity is a judge-made rule designed to strike the classic balance between freedom and security." *Henry v. Purnell,* 619 F.3d 323, 345 (4th Cir. 2010) (Gregory, J. dissenting).  The actions of the Federal and Commission defendants in the present case typify an imbalanced preoccupation with security to the virtual exclusion of basic constitutional protections.

While federal actors are generally shielded from liability when performing discretionary functions, this qualified immunity is not available if the Complaint alleges that the officer's conduct violated an individual's constitutional rights and those rights were "clearly established" at the time of the alleged violation.  *See, e.g.*, *Harlow*, 457 U.S. at 818; *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson v. Callahan*, 129 S.Ct. 808 (2009); *Doe v. S.C. Dep't. of Social Servs.*, 597 F.3d 163 (4th Cir. 2010). The rule "is intended to 'balance [] two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield

- 11 -

officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "If the law is clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 818-19.

Under the first prong of the *Harlow* test, to survive a motion to dismiss, the plaintiff must simply demonstrate that the complaint alleges facts sufficient to support a constitutional claim. *Id.* Under the second prong, the contours of the right must be sufficiently clear that a reasonable official would understand what he or she is doing violates that right, but there need not be any previous decision addressing the precise facts at issue. *See Melgar v. Green*, 593F.3d 348, 358 (4th Cir. 2010); *see also Burgess v. Lowery*, 201 F.3d 942, 944-45 (7th Cir. 2000) (noting that "the absence of a decision by the Supreme Court or this court cannot be conclusive on the issue [of] whether a right is clearly established"). Indeed, the Supreme Court has recognized that "officials can still be on notice that their conduct violates established law even in novel factual circumstances," expressly rejecting "a requirement that previous cases be 'fundamentally similar.'" *Hope v. Pelzer*, 536 U. S. 730, 741 (2002) (citation omitted).

**A.    Plaintiff's Amended Complaint Alleges a Clearly Established Fourth Amendment Violation.**

While the TSA has authority to conduct searches at airport security checkpoints, that authority has limits. *See, e.g.*, *Shelton v. Tucker*, 364 U.S. 479, 488 (1960) (even when administrative security interests are "legitimate and substantial," the interests "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved"); *U.S. v. Aukai*, 497 F.3d 955 (9th Cir. 2007) ("[T]he scope of such searches is not limitless [and]is constitutionally reasonable [if] it

"is no more extensive nor intensive than necessary, in the light of current technology, to detect the presence of weapons or explosives [][and] that it is confined in good faith to that purpose.").  Courts require that airport security searches be "minimally intrusive," "well-tailored to protect personal privacy," and "neither more extensive nor more intensive than necessary under the circumstances to rule out the presence of weapons or explosives."  *U.S. v. Hartwell*, 436 F.3d 174, 180 (3d Cir. 2006).  Searches are constitutionally reasonable only if they "escalat[e] in invasiveness [] after a lower level of screening disclose[s] a reason to conduct a more probing search."  *Id.*

The Federal Defendants rely almost exclusively on *Aukai*, to support their argument that their actions as alleged comported with the Fourth Amendment.  Fed. Def. Br. at 11-15.  To state the facts of *Aukai* is to show why this case compels a different result.  There, an airline passenger set off alarms at both the walk-through magnetometer and during a hand wand "search."  Seeing two indicators of a potential security concern, the TSA prevented Plaintiff from opting out of further airport "pat-down" screening. After a TSA agent incurred repeated "hand wand alarms" on the passenger, and after referral to a TSA supervisor and further unsatisfactory "wanding," followed by tactile verification of an unidentified substance in the passenger's pocket, the TSA supervisor required the passenger to empty his pockets and discovered a package of methamphetamine, and *then* handed him over to state law enforcement officials.  *Aukai*, 497 F.3d at 962.

The Court rejected the Defendant's argument that the drug evidence constituted the fruit of an unlawful search.  The Ninth Circuit held that in these circumstances, the

TSA did not require the passenger's consent to do a pat down search.  The Court further explained:

> Like the Third Circuit, we find these search procedures to be minimally intrusive.  *See Hartwell,* 436 F.3d at 180 (holding similar search procedures to be "minimally intrusive," explaining that the procedures are "well-tailored to protect personal privacy, escalating in invasiveness only after a lower level of screening disclosed a reason to conduct a more probing search").
>
> The duration of the detention associated with this airport screening search was also reasonable. Witnesses testified that Aukai entered the checkpoint area at approximately 9:00 a.m. and that the entire search at issue—starting from when Aukai walked through the checkpoint until the TSA's efforts to rule out the presence of a weapon resulted in the discovery of drug paraphernalia—took no more than 18 minutes.

*Id.* at 962-63.

The disparity of the treatment afforded to Plaintiff by the Federal and Commission Defendants compared to the *Aukai* case is only too obvious.  The clearly established law evidencing the constitutional limitations on airport screening set forth in *Aukai*, and the cases recited in that opinion, only amplify the Defendants' failure to observe these well-established constitutional boundaries here.

Without referencing any allegation in the Amended Complaint, the Federal Defendants argue that Plaintiff "refused TSO Smith's direction to proceed through the AIT."  Fed. Def. Br.. at 12.  The Federal Defendants assert that such actions "amounted to a request to opt out of the scanner."  *Id.*  The Complaint does not, however, allege that Plaintiff refused any direction by Defendant Smith.  To the contrary, Paragraph 65 of the Amended Complaints states unequivocally that Plaintiff "remained quiet, composed, polite, cooperative and complied with the requests of agents and officers."  Paragraph 32

- 14 -

states that Defendant Smith "informed Plaintiff that removal of clothing was not necessary," but did not allege that Defendant Smith directed Plaintiff to do anything. Paragraph 33 indicates that Defendant Smith immediately radioed for assistance, after which she instructed Plaintiff to stay where he was in front of the AIT unit.  No allegation in the Amended Complaint suggests that Plaintiff, at any point, refused to proceed through the AIT screener or disobeyed any instruction of Defendant Smith.  Perhaps the Federal Defendants wish to prove a different version of what happened; but they cannot do that on a motion to dismiss when the Amended Complaint directly contradicts it.

Read properly, *Aukai* supports Plaintiff's position that the Federal Defendants actions directly resulted in the deprivation of his Fourth Amendment rights.  It is well settled that, an individual's Fourth Amendment rights are violated where the "investigative methods" employed by law enforcement officials are not the "least intrusive means reasonably available to verify or dispel the officer's suspicion" of unlawful conduct.  *See, e.g., Florida v. Royer*, 460 U.S. 491, 500 (1983).  Thus, "[w]hether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time.'"  *Maryland v. Macon*, 472 U.S. 463, 470-71 (1985) (citation omitted).  Here, Defendants Smith and Jones detained Plaintiff *immediately* after revealing the text of the Fourth Amendment on his chest and then procured his arrest by local law enforcement — despite the fact that he was otherwise fully compliant and willing to proceed through the AIT scanner.  At no point did Defendants Smith and Jones undertake to determine whether Plaintiff was a security risk.  At no point did they conduct any investigation of Plaintiff on their own.  At no point did they direct Plaintiff to an experienced interrogator

on security risks, such as an Air Marshal.  It took an additional two hours, in which

Plaintiff sat handcuffed, and was threatened and charged in the airport police station,

before the TSA sent a Federal Air Marshal who finally spent a few minutes asking

arguably permissible questions, and then Plaintiff was released.  Such conduct by the

Federal Defendants clearly violated Plaintiff's Fourth Amendment rights.

Defendants Smith's and Jones' actions in turning Plaintiff over to the RIC

Officials also directly resulted in Plaintiff's Fourth Amendment deprivations.  It is

"clearly established that an arrest without probable cause violates a person's Fourth

Amendment rights."  *See, e.g., Knox v. Southwest Airlines*, 124 F.3d 1103, 1107 (9th Cir.

1997); *see also Smith v. Reddy*, 101 F.3d 351, 356 (4th Cir. 1996) ("the Fourth

Amendment right to be arrested only on probable cause is clearly established"); *Swagler

v. Neighoff*, 398 Fed.Appx. 872, 881 (4th Cir. 2010) ("[a]n unlawful arrest is one effected

in the absence of probable cause").  Likewise, "[t]he Fourth Amendment's proscription

against unreasonable seizures is implicated. . . if an 'officer, by means of physical force

or show of authority, . . . in some way restrain[s] the liberty of a citizen.'" *Buffkins v. City

of Omaha*, 922 F.2d 465 (8th Cir. 1991), citing *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968).

For Plaintiff's seizure to be constitutional under the Fourth Amendment, (1) there must

have been a reasonably articulable suspicion that Plaintiff  had committed or was about to

commit a crime (*Terry*, 392 U.S. at 21), and (2) the "[r]easonable suspicion must [have

been] formed *before* the seizure occur[ed].  *Buffkins*, 922 F.2d at 469 (airport seizure and

arrest invalidated for lack of reasonable suspicion and probable cause).

Here, the Amended Complaint alleges that while Plaintiff was detained at the

direction of Defendants Smith and Jones, he was handcuffed and arrested by RIC police

- 16 -

who came up from behind without viewing the message on his chest, or inquiring of

Defendant Smith, or interrogating Plaintiff.  Under the facts alleged, it may be reasonably

inferred that Defendants Smith and Jones had asserted to police that Plaintiff had

committed, or was about to commit a crime, when in fact, there was no reasonable basis

for such an assertion.  Thus, Plaintiff was seized and arrested and later charged with

disorderly conduct without any facts to support such a charge.  Such conduct, engaged in

jointly by the Federal and Commission defendants, clearly violated Plaintiff's Fourth

Amendment rights.  *See, e.g., Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th

Cir. 2010) (finding a Fourth Amendment violation where officer's did not have probable

cause to arrest and charge a person with disorderly conduct for expressing his First

Amendment rights).

> **B.      Plaintiff's Amended Complaint Alleges a Clearly Established First
> Amendment Violation.**

Plaintiff alleges that the Federal Defendants, acting in concert with the

Commission Defendants, violated Plaintiff's First Amendment rights because of the

message conveyed by Plaintiff's silent, nonviolent expression as to the constitutionality

of TSA's enhanced body imaging/pat-down policies.  Am. Compl. ¶¶ 104-109.  Plaintiff

further alleges that the conduct of the Federal Defendants resulted in Plaintiff's

subsequent arrest, made without probable cause.  *Id.*

Individuals possess First Amendment rights at U.S. airports, s*ee, e.g.*, *Board of*

*Airport Comm'rs v Jews for Jesus*, 482 U.S. 569 (1987) (the Supreme Court found

facially invalid a regulation adopted by the Board of Airport Commissioners for Los

Angeles Airport that stated the airport was "not open for First Amendment activities by

any individual").[3]  There, the Court noted that "[m]uch non-disruptive speech — such as

the wearing of a T-shirt or button that contains a political message — may not be

'airport-related,' but it is still protected speech even in a nonpublic forum." *Id.* at 576

(citing *Cohen v. California*, 403 U.S. 15 (1971)).  Related claims of content and

viewpoint discrimination have long formed the basis of First Amendment violations, *see,*

*e.g.*, *Rosenberger v. Rector & Visitors*, 515 U.S. 819, 828-829 (1995) (noting that the

government may not regulate speech on the basis of either substantive content or

viewpoint).  Governmental actors violate the First Amendment by unreasonably

regulating speech in an "effort to suppress expression merely because [the] public

official[] oppose[s] the speaker's view." *The News & Observer Publ'g Co.*, 597 F.3d at

577-78 (citing *Multimedia*, 991 F.2d at 159).

     Relying on 49 C.F.R. § 1540.109 and the Sixth Circuit's decision in *Rendon v.*

*TSA*, 424 F.3d 475 (6th Cir. 2005), the Federal Defendants claim they were justified in

detaining Plaintiff and turning him over to the Commission Defendants because Plaintiff

engaged in "distracting behavior that prevented [Defendant] Smith from performing

required screening when he failed to follow her direction to proceed through the AIT

scanner." Fed. Def. Br. 15-17.  This argument misses the mark both factually and

legally.

     First, the Federal defendants justify their actions on 49 C.F.R. 1540.109's

proscription that "[n]o person may interfere with, assault, threaten, or intimidate

---

[3] *See also Lee v. Int'l Soc. for Krishna Consciousness, Inc.*, 505 U.S. 830, 831 (1992) (holding that the ban on distribution of literature in the Port Authority airport terminals is invalid under the First Amendment); *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 577-78 (4th Cir. 2010) (a ban on news-racks at the Raleigh-Durham Airport violated the First Amendment); *Multimedia Publ'g Co. of S.C., Inc. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154 (4th Cir. 1993) (finding a ban on newspaper racks at Greenville-Spartanburg Airport violated the First Amendment).

screening personnel in the performance of their screening duties under this subchapter." This regulation, however, does not apply to these facts because the Complaint cannot be reasonably read to suggest that Plaintiff engaged in any interference, assault, threat or intimidating conduct against TSA officials.

Second, *Rendon* cannot be read to justify the conduct here.  In that case, an airline passenger, frustrated with an extended wait in the screening line, "actively engag[ed] the screener with loud and belligerent conduct," harassing the screener to the point where the screener was forced to shut down his line and call his supervisor to deal with the passenger.  *Id.* at 479.  Plaintiff here was not disruptive, did not fail to comply with any TSA directive or request, did not interfere with their performance of screening duties — unless of course, the message on his was deemed objectionable, in which case the Federal Defendants impermissibly retaliated against him for the lawful exercise of his constitutional right to Free Speech.

The Amended Complaint alleges that Defendants Smith and Jones took action against Plaintiff based upon his display of the Fourth Amendment on his chest in protest of the TSA's enhanced screening policies.  Am. Compl. ¶ 105.  It alleges that, in agreeing to security protocols and procedures that gave unrestrained discretion to TSA agents to exercise standardless discretion in censoring speech and otherwise exceed the limitations imposed by such procedures, Defendants Napolitano and Pistole were deliberately indifferent in their duties to train, supervise and oversee the personnel acting under their authority, including Defendants Smith and Jones, to avoid improper discrimination by TSA officials in regards to the content and/or viewpoint(s) of speech at RIC.  *Id.* at 106.

Accordingly, Plaintiff has alleged content and viewpoint based First Amendment claims

against the Federal Defendants which, as noted above, are well recognized.

### C.    Plaintiff's Amended Complaint Alleges a Clearly Established Fifth Amendment Violation.

The Federal Defendants argue that Plaintiff's Equal Protection claim under the

Fifth Amendment should be dismissed because Plaintiff failed to state a claim for

disparate treatment.  Fed. Def. Br. 17.  Plaintiff, however, alleges only that the Federal

Defendants treated his expression differently, and him differently than other passengers

who engaged in similar First Amendment expression.  Am. Compl. ¶¶ 70, 80, 93, 110-

116.  The allegations include the facts that the Commission "permitted a variety of

speech, individual symbolic speech, including speech on clothing, and commercial

speech in and around the RIC terminal, concourse and screening areas, of bare-chested

persons, persons in bathing suits, and persons dressed in running shorts and other athletic

apparel." *Id*. ¶ 70.  It further alleges that Plaintiff was subjected to "unlawful viewpoint

discrimination as against expressive activity permitted at RIC" and that Defendants Smith

and Jones treated him differently from other air travelers.  *Id*. ¶ 111.  Accordingly,

Plaintiff has stated an Equal Protection claim under the Fifth Amendment against the

Federal Defendants.

The Supreme Court has stated that "the purpose of the equal protection clause of

the Fourteenth Amendment is to secure every person within the State's jurisdiction

against intentional and arbitrary discrimination, whether occasioned by express terms of a

statute or by its improper execution through duly constituted agents." *Village of*

*Willowbrook v. Olech,* 528 U.S. 562, 564 (2000).  This keeps "governmental decision

makers from treating different persons who are in all relevant aspects alike." *Morrison v.*

*Garraghty*, 239 F.3d 648, 653-54 (4th Cir. 2001) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)); *Park Shuttle N Fly, Inc. v. Norfolk Airport Auth., Norfolk Int'l Airport*, 352 F. Supp. 2d 688, 697 (E.D. Va. 2004). The Supreme Court has also made clear that equal protection claims may be "brought by a 'class of one,' where the plaintiff alleges that []he has been intentionally treated differently from others similarly situated. . . ." *Village of Willowbrook*, 528 U.S. at 566; *accord*, *Willis v. Town of Marshall, N.C.*, 426 F.3d 251, 263 (4th Cir. 2005) (reversing grant of summary judgment where individual selectively banned from town dance club because of peculiar style of dancing alleged equal protection violation).

To bring an equal protection claim, a plaintiff "must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Veney v. Wyche*, 293 F.3d 726, 730-31 (4th Cir. 2002) (citation omitted); *see also Anderson v. Cornejo*, 284 F. Supp. 2d 1008, 1037-38 (N.D. Ill. 2003) (stating that "one similarly situated person from the unprotected class who was treated differently is enough to satisfy the discriminatory effect requirement"). Once this has been established, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.*; *see also San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 37-38 (1973) (stating that strict scrutiny applies when state or federal action "deprive[s], infringe[s], or interfere[s] with the free exercise of some fundamental right or liberty") (internal quotation and citations omitted). Since the constitutional deprivation in the present case involved the fundamental right to travel, the disparity in treatment would be subject to strict scrutiny. *Shapiro v. Thompson*, 394 U.S. 618 (1969).

In accord with this standard, Plaintiff's Amended Complaint alleges that there was a variety of speech activity at RIC on the day he was detained and arrested, and that his expression was treated differently by the Federal Defendants from other speech in the terminal and he was treated differently from other air travelers subject to the same screening process — that is, passengers exercising their First Amendment rights — in an unreasonable and discriminatory manner, and without a compelling government interest. Am. Compl. ¶¶ 111, 113.  It was this unequal treatment of Plaintiff as a class of one that directly and proximately caused Plaintiff to be detained and arrested without probable cause, to be falsely imprisoned, and to suffer unnecessary physical discomfort, embarrassment, and mental suffering, and which presents a valid equal protection claim. *Id.* ¶ 115.

While the allegations of the Amended Complaint are more than sufficient to survive the Federal defendants' motion to dismiss, Plaintiff posits as well that discovery will demonstrate what is alleged in the Amended Complaint, namely, that he was treated differently than other similarly situated airline passengers.  This Court can take judicial notice that since the initiation of enhanced screening procedures in early November 2010, at least half a dozen well-publicized "strip protests" have occurred — all without incident.  For example, on November 23, 2010, a college student stripped down to a Speedo bathing suit at a Salt Lake City airport, revealing the words "Screw Big Sis" on his back.[4]  He was ordered twice to put his clothes back on by a TSA agent, which he refused.  After attempting in vain to coax the passenger into putting on his clothes, the

---

[4] Indeed, TSA spokesman Dwayne Baird remarked of the Utah Speedo protestor — "He's not a security threat" and "[w]e would have no reason to detain him."  *See* David Knowles, *TSA Protester Strips Down to Speedo,* AOL News (Nov. 24, 2010), appearing at http://www.aolnews.com/2010/11/24/tsa-protester-strips-down-to-speedo-video/.

agents permitted him to proceed in his bathing suit.  There have been similar incidents in

other U.S. airports:

> ● On November 21, 2010, a woman stripped to her underwear at the Seattle-
> Tacoma airport to board her flight.  Though ordered to place her coat back on, she
> refused, and was allowed to pass through a metal director and continue on her
> way. *Make Flying Fun with a TSA Striptease*, THE GUARDIAN,  Dec. 1, 2010,
> http://www.guardian.co.uk/commentisfree/cifamerica/2010/dec/01/tsa-striptease-
> us-airport-security.

> ● On November 24, 2010, a man at a LaGuardia Airport in New York City
> entered the security checkpoint only in his underwear, and was allowed to pass
> through the metal detector without incident. T.J. Raphael and Corky Siemaszko,
> *New Yorker Strips to Underwear for LaGuardia Security, Wanted Pat Down to
> 'Stand Up' For Americans*, N.Y. DAILY NEWS, Nov. 24, 2010, http://www.nydaily
> news.com/ny_local/2010/11/24/2010-11-24_new_yorker_strips_to_underwear_
> for_laguardia_security_wanted_pat_down_to_stand_u.html.

> ● Also, on November 24, 2010, a woman at Los Angeles International Airport
> went through the security checkpoint in a bikini and was allowed to continue
> without incident. Jonathan Lloyd and John C. Klemack, *Have Bikini, Will Travel*,
> NBC LOS ANGELES, Nov. 25, 2010,
> http://www.nbclosangeles.com/traffic/transit/ Traffic-LAX-holiday-travel-
> thanksgiving-110384004.html.

> ● Similarly, on November 25, 2010, a man passed through the security
> checkpoint at Sky Harbor Airport in Phoenix wearing only his Speedo swimwear
> with the words "I Heart TSA" written across his back.  He, too, was allowed to
> proceed to his flight without incident. *Passengers are Stripping During Airport
> Screenings to Support, Protest New TSA Regulations*, FOX NEWS, Dec. 6, 2010,
> http://www.foxnews.com/us/2010/12/06/passengers-strip-airports-protest-support-
> new-tsa-regulations.

> ● And, on December 1, 2010, a woman passed through security at the Will
> Rogers World Airport in Oklahoma city without incident despite the fact that she
> was wearing only a bra and panties. Caroline Black, *Tammy Banovac, Protesting
> TSA Pat-Downs, Confronts Airport Security in Bra and Panties*, CBS NEWS, Dec.
> 1, 2010, http://www.cbsnews.com/8301-504083_162-20024321-504083.html.

In this case, however, instead of directing Plaintiff for further questioning by a

supervisor, as was done in the *Aukai* case, or completing the enhanced screening and

following up with further investigation, as necessary, as to Plaintiff's display of the

Fourth Amendment on his chest, the TSA agents procured the baseless arrest of Plaintiff, calling in the police for action under the joint TSA-Commission protocols.

The Federal Defendants also assert that TSA Management Directive 100.4 gives them unfettered discretion to treat airport passengers as they see fit.  Fed. Def. Br. 17-18 ("[N]othing in TSA MD 100.4 specifically precludes the actions taken by the TSO and the STSO. . . .  There is no right or wrong way to handle a specific issue as it arises during the security screening process.").  This language, however, obviously must be read in tandem with TSA Management Directive 100.4, which delineates the purpose of the screening.  TSA Management Directive 100.4 unambiguously states its purpose as to prevent, protect against, or respond to terrorist activities; not to provide federal agents with such broad authority that would lead to discrimination and infringement of individual constitutional rights.  Thus, the Federal Defendants' did not have any authority, let alone a compelling interest, pursuant to TSA Management Directive 100.4 that allowed them to discriminate against Plaintiff's exercise of clearly established constitutional rights.

For these reasons, Plaintiff's Amended Complaint sufficiently alleges that the Federal Defendants treated him differently from similarly situated air travelers who have peacefully exercised their First Amendment rights.

> **D.    Should the Court Conclude that the Controlling Law Is Not Clearly Established, the Federal Defendant's Motion Must Still Be Denied Because It Is Premature to Decide the Qualified Immunity Question.**

Significantly, a decision on qualified immunity is premature when there are unresolved disputes of material fact relevant to the immunity analysis.  *See, e.g.*, *Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002); *see also Swagler v. Neighoff*, 2009 WL 1575326 (D.Md. June 2, 2009), *rev'd on other grounds*, 398 Fed.Appx. 872 (4th Cir.

2010) ("it would be premature to rule upon the issue of qualified immunity at this juncture due to the undeveloped nature of the record").  Here, discovery has yet to commence and the record in this matter is sparse.  Accordingly, Plaintiffs has not yet had the opportunity to inquire into the circumstances surrounding and considerations governing the conduct of the Federal Defendants.  Similarly, the interplay between the Federal Defendants and the Commission Defendants will only be developed through the discovery process.  For example, before this suit was brought, Plaintiff's attorneys sought through an FOIA request to obtain all air transportation services agreements between TSA and the Commission.  While the Commission turned over the agreements referenced in the Amended Complaint, it refused, in a letter dated January 24, 2011 from Paul W. Jacobs, II to Plaintiff's counsel, James J. Knicely, to deliver the applicable "Airport Security Program" agreement between the TSA and the Commission, asserting that TSA's approval was required for such disclosure and that its consent had not been forthcoming.  This refusal to disclose a material agreement evidencing the applicable TSA/Commission agreements, customs, practices and protocols which very likely caused, or affected, the manner in which Plaintiff's rights were violated, justifies deferral of any qualified immunity adjudication, including any such determination with regards to Defendants Napolitano and Pistole, until at least the summary judgment stage.  *See, e.g.*, *Grant v. City of Pittsburgh*, 98 F.3d 116, 122 (3d Cir. 1996) (suggesting that qualified immunity questions are best resolved at the summary judgment stage); *see also Fortney v. Mullins*, 2011 WL 1885402, * 7 (N.D.W.Va. April 6, 2011) (noting that the a decision on qualified immunity would be "premature" where "[n]o discovery has as yet been conducted . . . [and] [n]o scheduling order has yet been entered").

Finally, should the court decide to grant the Federal Defendants' Motion to Dismiss, Plaintiff respectfully requests these claims be dismissed with leave to amend in the event that subsequent discovery on the remaining claims produce evidence of a Commission policy, practice, or custom. *See Harden v. Montgomery County*, No. 8:09-CV-031666, 2010 WL 3938326, at *3 n.3 (D. Md. Oct. 6, 2010).

Accordingly, it is premature to rule upon the Federal Defendants request for qualified immunity where, as here, the factual record is limited to the allegations pleaded in Plaintiff's Amended Complaint.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court deny the Federal Defendants' Motion to Dismiss, and allow Plaintiff to proceed to discovery.

Dated:  July 11, 2011

Respectfully Submitted,

By:   /s/ James J. Knicely_____
James J. Knicely (VSB #19356)
Robert Luther III (VSB #78766)
KNICELY & ASSOCIATES, P.C.
487 McLaws Circle, Suite 2
Williamsburg, Virginia 23185

Anand Agneshwar
Alan C. Veronick
ARNOLD & PORTER, LLP
399 Park Avenue
New York, New York 10022-4690

John W. Whitehead (VSB # 20361)
Douglas R. McKusick (VSB # 72201)
The Rutherford Institute
1440 Sachem Place
Charlottesville, Virginia 22906
*Of Counsel*

*Attorneys for Plaintiff, AARON TOBEY*