## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

AARON TOBEY,                 )
                                      )
        Plaintiff,         )
                                        )
       v.                 )   Civil Action No. 3:11CV154–HEH
                                        )
JANET NAPOLITANO, in her official   )
capacity as Secretary of Homeland Security,   )
U.S. Department of Homeland Security,   )
Washington, D.C. 20528, *et al.*,        )
                                        )
        Defendants.      )

### <u>MEMORANDUM OPINION</u>
**(Granting Commission Defendants' Motions to Dismiss; Granting in Part and Denying in Part Federal Defendants' Motion to Dismiss)**

This civil rights action arises out of events which allegedly occurred at the

Richmond International Airport ("RIC") on December 30, 2010. It is presently before

the Court on two separate motions to dismiss, one by Janet Napolitano ("Napolitano"),

John Pistole ("Pistole"), Rebecca Smith ("Smith"), and Terri Jones ("Jones")[1]

(collectively, "the Federal Defendants"), the other by the Capital Region Airport

Commission ("the Commission") and several RIC Police officers in their official

capacities. The Court heard oral argument on August 10, 2011. For the reasons stated

below, the Commission Defendants' Motion will be granted, and the Federal Defendants'

Motion will be granted in part and denied in part. Accordingly, Counts One through

---

[1] Pursuant to the Stipulated Protective Order entered on May 27, 2011, the Court employs pseudonyms for Transportation Safety Officers ("TSOs") Smith and Jones. A copy of Plaintiff's First Amended Complaint disclosing Smith and Jones's true identities has been filed under seal with the Court.

Three will be dismissed as to all defendants in their official capacities, and Counts One

and Three will be dismissed as to Smith and Jones individually.  With respect to

Plaintiff's Count Two claim against Smith and Jones individually, however, the Federal

Defendants' Motion to Dismiss will be denied.

## I.

In the wake of the 9/11 terrorist attacks, Congress created the Transportation

Security Administration ("TSA") to maintain "security in all modes of transportation" in

the United States, including civil aviation.  49 U.S.C. § 114(d).  The TSA is statutorily

required to "provide for the screening of all passengers and property . . . that will be

carried aboard a passenger aircraft . . . ."  49 U.S.C. § 44901(a).  For flights originating in

the United States, that screening must take place prior to boarding.  *Id.*  Persons who

interfere with the screening process may be subject to civil penalties.  *See* 49 C.F.R. §

1503.401.

As part of its air passenger screening process, the TSA requires passengers to pass

through a magnetometer (i.e., a metal detector).  The TSA also allegedly has a policy of

randomly selecting passengers for "enhanced secondary screening."[2]  (Pl.'s First Am.

Compl. ¶ 15.)  Under the enhanced secondary screening policy, passengers allegedly

have a choice of submitting to either (a) an Advanced Imaging Technology ("AIT") scan,

"which produces a highly detailed picture of the passenger's unclothed body," or (b) "a

---

[2] The Federal Defendants deny that the magnetometer is the TSA's "primary screening apparatus" and that the AIT is a form of "secondary screening." (Fed. Defs.' Reply 5 n.1.) Rather, they assert that the AIT and the magnetometer function together as the TSA's primary screening tools. (*Id.* (citing *Elec. Privacy Info. Ctr., et al. v. U.S. Dep't of Homeland Sec.*, No. 10-1157, 2011 U.S. App. LEXIS 14503, at *3 (D.C. Cir. July 15, 2011)).) For the purposes of this motion, however, the Court takes as true Plaintiff's allegations.

full-body pat-down search." (*Id.* at ¶ 16.) In Plaintiff Aaron Tobey ("Plaintiff")'s view, these enhanced screening procedures violate the Fourth Amendment's prohibition against unreasonable searches and seizures.

On December 30, 2010, around 2:00 p.m., Plaintiff allegedly entered the security checkpoint area at RIC as a ticketed airline passenger bound for his grandfather's funeral in Wisconsin. "In anticipation of the possibility that he would be randomly selected for enhanced secondary screening," Plaintiff had written on his chest in black marker the text of the Fourth Amendment. (*Id.* at ¶ 26.) Plaintiff allegedly sought "to communicate his objection to the enhanced secondary screening implemented by TSA." (*Id.*)

"To avoid the possibility of causing delay for his fellow passengers," Plaintiff allegedly "waited for the number of people in line to diminish before entering the [security screening] area." (*Id.* at ¶ 27.) Once inside, he submitted his boarding pass and identification to the pre-screening agent and proceeded through the conveyor belt area. Plaintiff alleges that he placed his belt, shoes, and other personal items on the conveyor belt as directed. Then, "[u]pon information and belief," Plaintiff alleges that TSO Smith directed Plaintiff away from the primary screening apparatus and toward an AIT unit. (*Id.* at ¶ 30.)

Before entering the AIT unit, Plaintiff allegedly removed his t-shirt and sweatpants to reveal the message written on his chest. Smith allegedly advised Plaintiff "that removal of clothing was not necessary, but Plaintiff responded that he wished to do so to express his view that enhanced screening procedures were not constitutional." (*Id.* at ¶ 32.) Plaintiff allegedly stood in front of the AIT scanner in his running shorts and

displayed the message on his chest, at which point Smith radioed for assistance.  On information and belief, Plaintiff alleges that supervisory TSO Jones and/or another supervisory TSO ordered Smith to direct Plaintiff to remain in front of the AIT unit. Jones then allegedly sought intervention by the RIC Police.

Shortly thereafter, RIC Police officers Calvin Vann ("Vann") and Anthony Mason ("Mason") allegedly approached Plaintiff from behind.  At the direction of Mason, Vann allegedly seized and handcuffed Plaintiff and "forced him through the AIT unit," and over to a side area.  (*Id.* at ¶ 35.)  Once there, Plaintiff was allegedly placed under arrest. Plaintiff alleges that Mason and Smith or other TSA agents collected Plaintiff's belongings, and Vann took Plaintiff to RIC's on-site police station.

At the police station, Plaintiff was allegedly questioned by Vann; Mason; RIC police officer Jeffrey Kandler ("Kandler"); and the RIC Chief of Police, Quentin Trice ("Trice").  Kandler allegedly questioned Plaintiff about his age, residency, and education; accused him of being inconsiderate of other travelers; and advised "that the police would make sure" he had "a permanent criminal record as a result of his actions." (*Id.* at ¶ 41.) Kandler then allegedly advised Plaintiff that he would be transported to the Henrico County Jail to meet with a local magistrate.[3]

Plaintiff alleges that one of the defendant officers searched Plaintiff's belongings, and Vann conducted a second search shortly thereafter.  According to Plaintiff, Vann discarded items such as Plaintiff's toothbrush, deodorant, writing utensils, and the t-shirt

---

[3] On information and belief, Plaintiff further alleges that Trice contacted the University of Cincinnati Police and advised that Plaintiff, a University student, had been arrested.  Trice also allegedly "suggested [that] the University Police notify the Dean of Students in an attempt to defame the name and good reputation of Plaintiff. . . ." (*Id.* at ¶ 50.)

that Plaintiff had removed prior to the AIT screening. Vann allegedly asserted that these items would be considered contraband at the Henrico County Jail.

Approximately ten minutes later, Kandler allegedly informed Plaintiff that he had spoken with the magistrate, and Plaintiff would not need to be transported to jail. Rather, he asserted, Plaintiff would be given a court date for arraignment in the near future. One of the defendant officers removed Plaintiff's handcuffs and directed him to put his clothing back on.[4] Vann then delivered to Plaintiff a summons charging disorderly conduct in a public place, in violation of Virginia Code Section 18.2-415. Vann allegedly explained to Plaintiff the summons, the nature of the crime, and the potential consequences if Plaintiff failed to appear in court. Plaintiff signed the summons and was allegedly ordered to repack his belongings. Plaintiff alleges that none of the officers retrieved or returned the items that Vann had previously discarded.

One of the defendant officers allegedly informed Plaintiff that he could leave for his flight after speaking with an Air Marshal from the Federal Air Marshal's Joint Terrorism Task Force. An Air Marshal allegedly questioned Plaintiff about his "intentions and goals" (Pl.'s First Am. Compl. ¶ 61), as well as his involvement with terrorist organizations, and discussed with Plaintiff the need for enhanced screening procedures. Thereafter, the defendant officers released Plaintiff into the RIC terminal. Plaintiff passed through the security screening and boarded his flight without incident. Plaintiff alleges that the detention lasted approximately one and one-half hours in total.

---

[4] While being questioned at the RIC police station, Plaintiff was allegedly wearing only his running shorts, with no shirt or shoes.

Plaintiff's disorderly conduct charge was subsequently *nolle prossed* on motion of the Henrico County Commonwealth's Attorney.

Based on the foregoing, Plaintiff filed this action pursuant to 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999 (1971). Smith, Jones, Vann, Mason, Kandler, and Trice have been sued individually and in their official capacities. Plaintiff has also named as defendants the Commission, a governmental authority created under Virginia law and granted authority to operate, manage, and regulate RIC; Victor Williams ("Williams"), the Director of Public Safety and Operations at RIC; Napolitano, the Secretary of the Department of Homeland Security; and Pistole, the Administrator of the TSA. Williams, Napolitano, and Pistole have been sued only in their official capacities.

In Counts One through Three, Plaintiff alleges that Smith, Jones, Vann, Mason, Kandler, and Trice violated Plaintiff's rights under the First, Fourth, and Fifth and Fourteenth Amendments. Plaintiff specifically alleges that these officers (1) caused Plaintiff's arrest without probable cause; (2) engaged in impermissible viewpoint discrimination against Plaintiff's silent, nonviolent protest against the TSA's screening policies; and (3) exceeded their statutory and regulatory authority when they "treated Plaintiff differently from other air travelers subject to the same screening process." (Pl.'s First Am. Compl. ¶ 111.) Plaintiff further alleges that Napolitano, Pistole, the Commission, and Williams are liable for the same in their official capacities because they

failed and/or were deliberately indifferent in their respective duties to train, supervise and oversee personnel under their authority.[5]

On May 13, 2011, the Commission, Williams, Vann, Trice, Mason, and Kandler (collectively, "the Commission Defendants")[6] moved to dismiss with prejudice Plaintiff's claims against them in their official capacities in Counts One, Two, and Three pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[7]  Plaintiff has responded, and the Commission Defendants have replied.

---

[5] Counts Four and Five, which charge Vann, Mason, Kandler, and Trice with false imprisonment and malicious prosecution, are not challenged in either motion to dismiss.

[6] Originally, Plaintiff's Complaint named as defendants Napolitano; Pistole; the Commission; Williams; Vann; and three persons of unknown identity—John Smith, individually and in his capacity as a TSO; and John Does #1 and #2, individually and in their official capacities as RIC police officers.  The Commission, Williams, and Vann filed the instant partial motion to dismiss on May 13, 2011.  They subsequently consented to the filing of an amended complaint to identify the John Smith and John Doe defendants.  Plaintiff's First Amended Complaint, filed on May 27, 2011, replaced John Smith with TSOs Rebecca Smith and Terri Jones, and substituted Trice, Mason, and Kandler for the John Doe defendants. Because the Commission, Williams, and Vann noted in their opening memorandum that "the same argument for dismissal of the Constitutional claims that apply to Vann also apply to the John Does to the extent of their actions in their official capacities" (*see* Mem. Supp. Comm'n Defs.' Mot. Partially Dismiss 9 n.3 [hereinafter Comm'n Defs.' Mem. Supp.]), this Court reads the Commission Defendants' Motion to Partially Dismiss as seeking dismissal of Counts One through Three as to the Commission, Williams, Vann, Trice, Mason, and Kandler in their official capacities.

The Court should also note that Plaintiff represented that "the sole purpose of the amendment with respect to the [Commission] Defendants [wa]s to identify the pseudonym parties John Doe #1 and John Doe #2 and not to otherwise alter its allegations contained in the Complaint as originally filed." (Consent Mot. Extend Time and File ¶ 9.)  Notwithstanding this assurance, Plaintiff's First Amended Complaint augmented his original Complaint in several respects.  For example, Plaintiff added that Trice is "the highest uniformed officer of the RIC Police force and responsible for the management, direction and supervision of the RIC Police and all police officers in the employ of the Commission." (Pl.'s First Am. Compl. ¶ 11.)  Even with the additional allegations, the Commission Defendants contend that Plaintiff's First Amended Complaint fails to state a claim against them in their official capacities. (Reply Mem. Supp. Comm'n Defs. 1 n.1 [hereinafter Comm'n Defs.' Reply].)

[7] The Commission Defendants also moved to dismiss Counts Four and Five to the extent they are asserted against the Commission and Williams. (*See* Mem. Supp. Comm'n Defs.' Mot. Partially Dismiss 9–10 [hereinafter Comm'n Defs.' Mem. Supp.].)  As this Court reads Plaintiff's First Amended Complaint, neither Count implicates the Commission or Williams. (*See* Pl.'s First Am. Compl. ¶¶ 117–25.)  Plaintiff has confirmed that Counts Four and Five are not asserted against the Commission or Williams. (Pl.'s Opp'n Defs.' Partial Mot. 14 [hereinafter Pl.'s Comm'n Opp'n].)

Also pending before the Court is a Motion to Dismiss filed by the Federal Defendants. The Federal Defendants assert that (1) Plaintiff has not pleaded facts sufficient to state a claim of supervisory liability on the part of Napolitano and Pistole; (2) Plaintiff's Complaint fails to state a claim against the Federal Defendants under 42 U.S.C. § 1983; and (3) Plaintiff's claims against Smith and Jones in their individual capacities fail because Smith and Jones are shielded by qualified immunity.[8] Plaintiff has responded, and the Federal Defendants have replied. Both motions to dismiss are ripe for decision.

## II.

Rule 8 of the Federal Rules of Civil Procedure provides that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint . . . [I]t does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

To survive a motion to dismiss, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). Mere labels and conclusions stating that the plaintiff is entitled to relief are not enough. *Id.* at 555, 127 S. Ct. at 1964–65. "[N]aked assertions of wrongdoing necessitate some factual enhancement within the

---

[8] The Federal Defendants also asserted that all claims for damages against them in their official capacities were barred by sovereign immunity. (Mem. Supp. Fed. Defs.' Mot. 6–8.) Plaintiff, however, does not seek money damages against the Federal Defendants. (Pl.'s First Am. Compl. Prayer for Relief ¶ E; Pl.'s Opp'n Fed. Defs.' Mot. 2 n.2 [hereinafter Pl.'s Fed. Opp'n].)

complaint to cross the line between possibility and plausibility of entitlement to relief."
*Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks
omitted).

A complaint achieves facial plausibility when it contains sufficient factual
allegations supporting the reasonable inference that the defendant is liable for the
misconduct alleged. *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965; *see also Ashcroft v.
Iqbal*, 129 S. Ct. 1937, 1949 (2009). This analysis is context-specific and requires "the
reviewing court to draw on its judicial experience and common sense." *Francis*, 588
F.3d at 193. The Court must assume plaintiff's well-pleaded factual allegations to be true
and determine whether those allegations "plausibly give rise to an entitlement to relief."
*Iqbal*, 129 S. Ct. at 1950. In addition, the Court "may consider official public records,
documents central to plaintiff's claim, and documents sufficiently referred to in the
complaint so long as the authenticity of these documents is not disputed." *Witthohn v.
Fed. Ins. Co.*, 164 Fed. App'x 395, 396–97 (4th Cir. 2006) (per curiam).

### III.

The Commission Defendants contend that Counts One through Three, which
assert various constitutional violations, fail to state a claim against the Commission
because the facts alleged do not support a reasonable inference "that the Commission
deprived him of his constitutional rights through an official policy or custom." (Comm'n
Defs.' Mem. Supp. 4.)

Plaintiff counters that municipal liability is appropriate because (1) the alleged
"[c]onstitutional [d]eprivations [w]ere the [r]esult of the Commission's [p]olicies,

[c]ustoms, and/or [p]ractices" (Pl.'s Comm'n Opp'n 7); (2) Trice, an official policymaker, sanctioned the course of action which led to the alleged constitutional violations; and/or (3) the Commission failed to properly train its officers and agents to respond to First Amendment protests.

Divorced from application to the immediate facts, the Commission Defendants agree with the legal principles underlying Plaintiff's claims—namely, that:

> [T]here are three ways in which Plaintiff may establish a policy or custom necessary to hold the Commission and its officials liable: (1) the existence of an articulated Commission policy that is unconstitutional; (2) a Commission policymaker directing an act that resulted in a violation of federal rights; or (3) by omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens.

(Comm'n Defs.' Reply 2 (citing *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)).)

The issue, however, is not whether a municipality can *ever* be liable for constitutional violations. Rather, the question is whether Plaintiff has alleged facts sufficient to support a reasonable inference that the Commission is liable in this case. *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965. This Court considers Plaintiff's three asserted grounds for municipal liability in turn.

### A.

Plaintiff advances two theories in support of his "policies, customs, and/or practices" argument. First, Plaintiff contends that "the Commission has adopted policies and procedures to facilitate and conduct passenger screening and law enforcement activities related to security at RIC." (Pl.'s Comm'n Opp'n 8.) Second, Plaintiff contends that the Commission's polices and procedures "vest[ed] 'standardless

10

discretion' in the RIC police . . . 'to make unlawful distinctions based on the content or viewpoint of speech.'" (*Id.* (quoting Pl.'s First Am. Compl. ¶ 87))

Notably, however, Plaintiff has not identified *any* Commission policy that even arguably condoned or fostered the alleged constitutional violations. To the contrary, with respect to his First Amendment claim, Plaintiff alleges that his "silent, nonviolent protest . . . was *not* contrary to rules and regulations promulgated by" the Commission; that the Commission's rules and regulations "authorize the exercise of First Amendment expression . . . by allowing picketing and handbilling to take place at RIC," and by "permit[ting] persons to engage in solicitation of funds from the general public . . . "; and that the Commission "permitted a variety of speech activities at RIC, including without limitation, airport and non-airport related speech, individual symbolic speech, individual speech, including speech on clothing, and commercial speech . . . ." (Pl.'s First Am. Compl. ¶¶ 67–68, 70.)[9]

These allegations notwithstanding, Plaintiff asserts that a municipal policy can be reasonably inferred from his references in the Complaint to TSA Management Directive 100.4 and "the Playbook Concept." (*See id.* at ¶ 21.) Plaintiff alleges that the Directive authorized the Playbook, and that the TSA provided guidance to the Commission on how to implement the Playbook. Thus, Plaintiff concludes that "[i]f the Defendant Officers followed these policies, customs, or practices, then those 'policies' authorized constitutional violations and directly led to Plaintiff's injuries." (Pl.'s Comm'n Opp'n 8.)

---

[9] Plaintiff also alleges that the applicable management directive required that searches be tailored "to protect personal privacy." (Pl.'s First Am. Compl. ¶ 19.) However, his Fourth Amendment claim relates to his *seizure*, not to a search.

Plaintiff's conclusory assertion is wholly insufficient to satisfy Rule 8. Plaintiff has not identified any policy or procedure in the Playbook or elsewhere.[10] Plaintiff essentially contends that if a set of screening guidelines existed, and a constitutional violation occurred during the screening process, then it necessarily follows that the guidelines *must* have authorized the constitutional violation. This is not a reasonable inference providing vitality to an otherwise moribund claim under *Twombly* and *Iqbal*. Accordingly, this Court finds that Plaintiff has not sufficiently alleged a Commission policy, custom, or practice supporting a reasonable inference of municipal liability.

*B.*

Plaintiff next contends that municipal liability can be reasonably inferred from his allegations concerning Trice. Specifically, Plaintiff asserts that municipal liability may be founded on the actions of a municipal official "'whose acts or edicts may fairly be said to represent official policy . . . *whether that action is to be taken only once or to be taken repeatedly.*'" (Pl.'s Comm'n Opp'n 9 (emphasis in original) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S. Ct. 1292, 1299 (1986)) (internal citation omitted).) Because Plaintiff alleges that Trice was an official policymaker who "directly sanctioned and actively participated in the constitutional deprivations," Plaintiff contends that the Commission itself is implicated "in authorizing and carrying out the unlawful conduct." (*Id.* at 11.)

---

[10] Although extraneous to the present analysis, the Court notes that Plaintiff received a copy of RIC's training manuals and rules before commencing this action. (Mot. Dismiss Hr'g Tr. 20:3–10.)

Plaintiff correctly notes that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur*, 475 U.S. at 480, 106 S. Ct. at 1298. "[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Id.* at 481, 106 S. Ct. at 1299.

The Supreme Court has emphasized, however, that "not every decision by municipal officers automatically subjects the municipality to § 1983 liability." *Id.* Rather, "municipal liability under § 1983 attaches where—and *only* where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483, 106 S. Ct. at 1300 (emphasis added).

In this case, Plaintiff alleges that Trice "was a Colonel and Chief of Police of the RIC Police force," who "was at all relevant time the highest uniformed officer of the RIC Police force and responsible for the management, direction and supervision of the RIC Police and and all police officers in the employ of the Commission." (Pl.'s First Am. Compl. ¶ 11.) Plaintiff further alleges that Trice and Williams shared "the responsibilities . . . in connection with the training and supervision of its police officers, and the operations and interactions of the RIC Police with other security personnel and agencies . . . at RIC." (*Id.*)

While Plaintiff's allegations may establish that Trice was a policymaker, they fall markedly short of suggesting that Trice directed any action which caused the constitutional violations alleged in this case. The constitutional violations purportedly

13

occurred when the TSA agents radioed for assistance and officers Vann and Mason

arrested Plaintiff. (*See id.* at ¶¶ 99, 105, 111.) Trice, however, became involved only

*after* Plaintiff had been placed under arrest and taken to the RIC police station.[11] There is

no indication that Trice directed or even knew about the actions of Vann, Mason, or the

TSA agents actions until after the fact.[12]

The cases on which Plaintiff relies are clearly distinguishable. In *Pembaur*, for

example, two sheriff's deputies were attempting to serve *capiases* on two employees at a

defendant doctor's office when the doctor barricaded himself and the witnesses inside.

475 U.S. at 472, 106 S. Ct. at 1294. The doctor then advised that he had called a local

media outlet, his lawyer, and the Cincinnati police. *Id.* Unsure of what to do, the

deputies called their supervisor, who instructed them to contact the County Prosecutor

and follow his instructions. *Id.* at 472–73, 106 S. Ct. at 1294–95. The County Prosecutor

advised the deputies to "go in and get [the witnesses]," which they did. *Id.* at 473, 106 S.

---

[11] At the RIC police station, Trice allegedly questioned Plaintiff intermittently and notified the University of Cincinnati Police Department of Plaintiff's arrest "in an attempt to defame the name and good reputation of Plaintiff." (Pl.'s First Am. Compl. ¶ 50.) Plaintiff, however, has not made any claims, constitutional or otherwise, based on these allegations.

[12] To the extent that Plaintiff contends Williams' alleged actions or directions support a claim of municipal liability, this Court disagrees. Plaintiff's allegations as to Williams are even more scant than his allegations regarding Trice. Indeed, Plaintiff simply alleges that Williams:

> [wa]s responsible for management, direction and supervision of the RIC Police and all police officers in the employ of the Commission, as well as for the development, promulgation, approval and implementation of all programs, policies, practices, procedures, customs and protocols of the RIC Police including . . . the training and supervision of its police officers, and the operations and interactions of the RIC Police with other security personnel and agencies . . . at RIC.

(Pl.'s First Am. Compl. ¶ 8.) Plaintiff's Complaint is devoid of any other allegations concerning Williams, with the exception of Plaintiff's conclusory assertion that Williams, along with Napolitano, Pistole, the Commission, Trice, and/or their subordinates, permitted or authorized uniformed officers to enforce disorderly conduct laws against Plaintiff for the purpose of discriminating against Plaintiff's speech, and that Williams was deliberately indifferent in his duties to supervise and train personnel under his authority. (*See id.* at ¶¶ 85–87, 100, 106, 113.)

14

Ct. at 1295 (alteration in original). When the doctor sued the county under Section 1983 for violation of his Fourth Amendment rights, the Supreme Court held that municipal liability was appropriate because the law enforcement officers acted at the direction of the County Prosecutor, the final legal decisionmaker for the county. *Id.* at 485, 106 S. Ct. 1301.

Plaintiff here, on the other hand, has not alleged any specific directive on the part of Trice or any other policymaker. There was no "go in and get [the witnesses]" (or the protester)-type command as in *Pembaur*. To the contrary, Plaintiff's Complaint contains no indication of any deliberate choice on the part of a municipal policymaker.

Plaintiff's reliance on *Pachaly v. City of Lynchburg*, 897 F.2d 723 (4th Cir. 1990), is similarly misguided. In *Pachaly*, the plaintiff argued that a single unconstitutional search of his radio station was evidence that the city "adhered to a policy condoning illegal searches and seizures." *Id.* at 726. The Fourth Circuit rejected this position as "untenable," because "[t]here [wa]s no evidence that the city pursued an impermissible policy of issuing and executing illegal search warrants or routinely conducted searches beyond the authorization of the single warrant" at issue. *Id.* Although *Pachaly* was decided on a motion for summary judgment, its holding applies with equal force here, where Plaintiff has not even *alleged* that the Commission engaged in unconstitutional conduct aside from the events of December 30, 2010.

In short, Plaintiff has not alleged any "affirmative decision[] of [an] individual policymaking official[]" sufficient to state a claim against the Commission, *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999), or even a suggestive course of prior conduct.

The Court therefore turns to Plaintiff's final contention—that he should be permitted to proceed against the Commission on a "failure to train" theory. (Pl.'s Comm'n Opp'n 11.)

C.

There is no dispute that "a city can be liable under § 1983 for inadequate training of its employees . . . ." *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 1204 (1989). "A policy or custom giving rise to § 1983 liability will not, however, 'be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees.'" *Newhard v. Borders*, 649 F. Supp.2d 440, 446 (W.D. Va. 2009) (quoting *Milligan v. Newport News*, 743 F.2d 227, 230 (4th Cir. 1984)). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Canton*, 489 U.S. at 389, 109 S. Ct. at 1205.

"'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of County Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410, 117 S. Ct. 1382, 1391 (1997). "A showing of simple or even heightened negligence will not suffice." *Id.* at 407, 117 S. Ct. at 1390. As the Supreme Court recently explained in *Connick v. Thompson*,

> [W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's "policy of inaction" in light of notice that its program will cause

16

constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." A less stringent standard of fault for a failure-to-train claim "would result in *de facto respondeat superior* liability on municipalities . . . ."

131 S. Ct 1350, 1360 (2011) (quoting *Canton*, 489 U.S. at 395, 392, 109 S. Ct. at 1208, 1206) (internal citations omitted).

"Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* at 1360. "Actual knowledge may be evidenced by recorded reports to or discussions by a municipal governing body. Constructive knowledge may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of them." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987).

Thus, for the purpose of failure-to-train liability, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference . . . ." *Connick*, 131 S. Ct. at 1360 (quoting *Bryan Cty.*, 520 U.S. at 409, 117 S. Ct. at 1391); *see also Canton*, 489 U.S. at 397, 109 S. Ct. at 1209 (O'Connor, J., concurring in part and dissenting in part) ("Municipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations . . . .").

Plaintiff here has not alleged any such pattern. Rather, Plaintiff asserts that:

Given the public nature of an airport, and widespread public controversy about the recently adopted enhanced digital body scanning and body pat-

17

down screening, the Commission obviously needed to train its officers and agents properly to respond to First Amendment protests.  Given that such protests were likely to recur based on the sheer number of passengers passing through RIC screening, it should have been obvious to the Commission that the failure to train would result in constitutional violations.

(Pl.'s Comm'n Opp'n 13.)

Plaintiff correctly notes that the Supreme Court in *Canton* "did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Bryan Cty.*, 520 U.S. at 409, 117 S. Ct. at 1391.  Plaintiff altogether ignores, however, the extremely narrow scope of this exception permitting municipal liability on a failure-to-train theory absent any pattern of constitutional violations.

The Supreme Court first articulated the single-incident theory of failure-to-train liability in *Canton*.  In dicta, the *Canton* Court hypothesized:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights.

489 U.S. at 390 n.10, 109 S. Ct. at 1205 n.10 (internal citation omitted).

The Court subsequently explained, however, that:

> In leaving open in *Canton* the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable

18

consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable.

*Bryan Cty.*, 520 U.S. at 409–10, 117 S. Ct. at 1391.

Underscoring the narrow scope of the exception, the *Bryan County* Court held that municipal liability for an assault and battery by a police officer was not appropriate where the officer's background included assault, battery, and other misdemeanors, and the county failed to adequately screen his background prior to hiring. *Id.* at 401, 415, 117 S. Ct. at 1387, 1394. Further emphasizing the limited application of this exception, the Court in *Connick v. Thompson* recently held that "[f]ailure to train prosecutors in their *Brady* obligations does not fall within the narrow range of *Canton*'s hypothesized single-incident liability." 131 S. Ct. at 1361.[13] Plaintiff has not identified any case in which *Canton*'s single-incident theory has been actively applied to support a claim of municipal liability.

Plaintiff's First Amendment claim is likewise beyond the narrow set of circumstances contemplated by the *Canton* Court. Plaintiff has not alleged any facts suggesting that protests in the form of passengers removing their clothes in the screening

---

[13] In *Connick*, a defendant whose armed robbery and murder convictions were reversed because of the prosecution's failure to disclose exculpatory evidence sought to hold the district attorney's office liable for the *Brady* violation. 131 S. Ct. at 1353.

area would be recurring, or that the failure to train officers in some unidentified respect would likely lead to First Amendment violations.  Nor can Plaintiff establish such likelihood based solely on his own experience or subsequent screening-area protests: "[C]ontemporaneous or subsequent conduct cannot establish a pattern of violations that would provide 'notice to the cit[y] and the opportunity to conform to constitutional dictates. . . ." *Connick*, 131 S. Ct. at 1360 n.7 (quoting *Canton*, 489 U.S. at 395, 109 S. Ct. at 1208).

Moreover, deliberate indifference cannot be alleged generally.  *See, e.g., Newhard*, 649 F. Supp. 2d at 446 (dismissing claim against Town because the plaintiff simply asserted in conclusory fashion that the Town "implemented and promulgated a departmental policy . . . demonstrating deliberate indifference").  Rather, the plaintiff must point to a specific deficiency or deficiencies that "make the specific violation 'almost bound to happen, sooner or later,' rather than merely 'likely to happen in the long run.'"  *Spell v. McDaniel*, 824 F.2d at 1390 (quoting *Patzner v. Burkett*, 779 F.2d 1363, 1367 (8th Cir. 1985)).  For example, the Fourth Circuit in *Spell* found sufficient the plaintiff's allegations that:

> with knowledge of repeated allegations of abusive and assaultive behavior toward . . . detainees and arrestees by [City] police officers . . . repeatedly . . . fail[ed] to enforce established procedures to insure the safety of individual arrestees and detainees; . . . establish[ed] and enforce[d] quota systems for arrests and citations . . .; . . . fail[ed] to discipline . . . police officers . . . who had been found to have committed abusive and assaultive behavior toward . . . detainees and arrestees; fail[ed] and refuse[d] to competently investigate allegations of abuse and assault . . . by . . . police officers . . .; reprimand[ed], intimidate[d], demote[d], and fire[d] police officers and officials who reported acts of abuse of authority by other[s] . . .; cover[ed] up acts of misconduct and abuse of authority by individual

> police officers and officials; . . . reward[ed] and commend[ed] . . . police
> officers who displayed aggressive, abusive and assaultive behavior towards
> . . . detainees and arrestees; repeatedly . . . fail[ed] to adequately train and
> educate police officers in the use of reasonable force and proper use of
> authority; repeatedly fail[ed] to adequately supervise the actions of police
> officers and officials under their control and supervision.

824 F.2d at 1392 (alterations in original).

Plaintiff here, in contrast, has not articulated any particular training

deficiency that should have been evident to the Commission, nor has he alleged

any facts suggesting that the Commission's training or lack thereof caused the

alleged constitutional violations.

In short, "[a] municipality's culpability for a deprivation of rights is at its most

tenuous where a claim turns on a failure to train." *Connick*, 131 S. Ct at 1359. "That a

particular officer may be unsatisfactorily trained will not alone suffice to fasten liability

on the city, for the officer's shortcomings may have resulted from factors other than a

faulty training program." *Canton*, 489 U.S. at 390–91, 109 S. Ct. at 1206. "In virtually

every instance where a person has had his or her constitutional rights violated by a city

employee, a § 1983 plaintiff will be able to point to something the city 'could have done'

to prevent the unfortunate incident." *Id.* at 392, 109 S. Ct. at 1206. This is precisely why

municipal liability requires a showing of deliberate indifference: "To adopt lesser

standards of fault and causation would open municipalities to unprecedented liability

under § 1983." *Id.* at 391, 109 S. Ct. at 1206.

To permit Plaintiff to proceed against the Commission under the facts alleged

would open the door to municipal liability in virtually every case involving a state

actor—a result that would directly counter the Supreme Court's repeated assertion that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 2036 (1978).

For these reasons, Plaintiff's claims against the Commission in Counts One through Three must be dismissed. In addition, because "damages may be awarded against a defendant in his official capacity only if they would be recoverable against the governmental entity itself," *Hughes v. Blankenship*, 672 F.2d 403, 405–06 (4th Cir. 1982), Plaintiff's claims against Williams, Vann, Trice, Mason, and Kandler in their official capacities must be dismissed as well.

### IV.

For much the same reasons, Plaintiff's Complaint fails to state a claim against Napolitano and Pistole in their official capacities. Plaintiff alleges that Napolitano "has authority over TSA's programs, policies, practices, procedures, customs and protocols, and the promulgation thereof, including, without limitation, policies, practices, procedures, customs and protocols of TSA in conducting security screening at airports located in the United States, and is responsible for ensuring compliance by TSA with applicable law." (Pl.'s First Am. Compl. ¶ 5.) Pistole allegedly reports to Napolitano "and is directly responsible for the administration and management of TSA's programs, policies, practices, procedures, customs and protocols, and the promulgation thereof . . . and the supervision of its employees, and is responsible for ensuring compliance by TSA with applicable law." (*Id.* at ¶ 6.) Plaintiff further alleges that Napolitano and Pistole

and/or agents under their control implemented TSA Management Directive 100.4. (*Id.* at ¶ 17.)

Plaintiff's only other allegations concerning Napolitano and Pistole, however, are mere conclusory assertions that they failed or were deliberately indifferent in their respective duties to train the defendant officers and others under their supervision. Plaintiff does not allege that they were directly involved in any way in the events of December 30, 2010, nor does he allege any facts suggestive of deliberate indifference. Accordingly, Plaintiff's claims against Napolitano and Pistole, like his claims against the Commission, are insufficient under *Twombly* and *Iqbal*. *Cf. Iqbal*, 129 S. Ct. at 1948 ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.")

Having decided that Plaintiff's claims in Counts One through Three must be dismissed as to the Commission Defendants, Napolitano, and Pistole, the Court now turns to whether Plaintiff has stated a claim against Smith and Jones in their official capacities and/or individually pursuant to 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999 (1971), respectively.

### A.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 2254–55 (1988).

The Federal Defendants contend that they are not subject to liability under § 1983 because they "acted exclusively under federal law"—not under color of state law— "when implementing and administering checkpoint screening policies at the Richmond International Airport."[14] (Mem. Supp. Fed Defs.' Mot. 9 (citing 49 U.S.C. §§ 44901(a), 44902(a), 114(e)).) Plaintiff counters that the Federal Defendants "acted hand-in-glove with the Commission Defendants under established security protocols to implement and coordinate the joint TSA-Commission security screening operation at RIC, including the referral of alleged criminal activity to the RIC police," and therefore acted under color of state law. (Pl.'s Fed. Opp'n 10–11.)

"Federal officials who violate federal rights protected by § 1983 generally do not act 'under color of state law,'" within the meaning of § 1983. *Olson v. Norman*, 830 F.2d 811, 821 (8th Cir. 1987); *see also District of Columbia v. Carter*, 409 U.S. 418, 424–25, 93 S. Ct. 602, 606 (1973) ("[A]ctions of the Federal Government and its officers are at least facially exempt from [§ 1983's] proscriptions."); *Kotmair v. Gray*, 505 F.2d 744, 746 (4th Cir. 1974) (finding that IRS agents were not subject to suit under § 1983). They may, however, be held liable under § 1983 if they "conspire with state officials." *Olson*, 830 F.2d at 821; *accord Cabrera v. Martin*, 973 F.2d 735, 742 (9th Cir. 1992) (explaining that federal officials "may be liable under § 1983 if they are found to have

---

[14] This argument applies with equal force to Napolitano, Pistole, Smith and Jones. However, because the Court has already found that Plaintiff's claims against Napolitano and Pistole should be dismissed, the Court limits its discussion of the Federal Defendants' § 1983 argument to Smith and Jones.

conspired with or acted in concert with state officials to some substantial degree");

*Knights of Ku Klux Klan Realm v. E. Baton Rouge Parish Sch. Bd.*, 735 F.2d 895, 900

(5th Cir. 1984) (explaining that federal officials may be liable under § 1983 where they

"conspire or act jointly with state officials to deny constitutional rights"); *Hampton v.*

*Hanrahan*, 600 F.2d 600, 623 (7th Cir. 1979); *Kletschka v. Driver*, 411 F.2d 436, 449 (2d

Cir. 1969).

"[W]hen federal officials are engaged in a conspiracy with state officials to

deprive constitutional rights, the state officials provide the requisite state action to make

the entire conspiracy actionable under section 1983." *Hampton*, 600 F.2d at 612.  In

other words, the state officials must exert some level of control or influence over the

federal officials, or the federal and state entities must act as one, in order for federal

officials to be liable under § 1983.  *See Kletschka*, 411 F.2d at 449 (finding that federal

officials were not subject to § 1983 liability because there was no indication that they

acted under the control or influence of the state defendants).  The test "is whether the

state or its officials played a 'significant' role in the result."  *Id.*

Notably, however, "[t]he intergovernmental nature of a joint state-federal program

does not by itself make out a conspiracy. . . ."  *Olson*, 830 F.2d at 821.  As the Sixth

Circuit explained in *Strickland v. Shalala*, "[t]o find that a state's efforts to comply with a

federal regulation transform a federal official—who merely promulgated and enforced a

federal regulation—into a state actor seemingly would render the United States subject to

§ 1983 liability in every case arising out of a cooperative federalism scheme."  123 F.3d

863, 868 (6th Cir. 1997).  Even more to point, several circuits have recognized that

pervasive federal involvement may cause state officials to act "under color of federal and not state law." *Knights of Ku Klux Klan*, 735 F.2d at 900 (citing *Ellis v. Blum*, 643 F.2d 68, 83 (2d Cir.1981); *Askew v. Bloemker*, 548 F.2d 673, 677–78 (7th Cir.1976)).

Against this standard, the Eighth Circuit in *Olson v. Norman* held that § 1983 liability did not attach to the Secretary of the Department of Health and Human Services where state officials followed the Secretary's directions in administering a state program tied to a federal Medicaid plan. 830 F.2d at 821. The Second Circuit in *Kletschka* similarly held that the Washington Veteran's Administration Hospital could not be liable under § 1983 because "any conspiracy was hatched at the local level," and "[t]here was no indication that th[e] [federal officials acted] . . . under the control or influence of the State defendants." 411 F.2d at 449.[15] On the other hand, the Seventh Circuit in *Hampton* held that federal officials were subject to § 1983 liability for constitutional violations that allegedly occurred in connection with a 4:30 a.m. raid of the plaintiff's apartment by fourteen officers, because "federal and state defendants shared in instigating and preparing for the raid." 600 F.2d at 623, 605.

In this case, Plaintiff alleges that the Commission has agreed to make law enforcement officers available to the TSA to enforce regulations and protocols of the TSA and the Commission at RIC. A Memorandum of Agreement between the TSA and the Commission allegedly creates a responsibility for the TSA

---

[15] The *Klestschka* Court further held that the plaintiff stated a claim against Syracuse Veterans Administration officials, because the state medical center had "so far insinuated itself into a position of interdependence with [the Syracuse Veterans Administration hospital] that" they acted as "joint participant[s]." 411 F.2d at 449.

"[t]o provide guidance as to the process and procedures necessary to implement the Playbook Concept," and further establishes a process by which TSA and the Commission "will act collaboratively for the purpose of combining layers of security and coordinating the assets of TSA, law enforcement, and other security partners at the airport to improve the overall airport security posture."

(Pl.'s First Am. Compl. ¶ 21 (capitalization altered).)[16]   In addition, the Memorandum of Agreement allegedly provides that the Commission has a responsibility "'to actively participate in the collaborative coordination of security countermeasures' and 'to assign airport resources, when available and appropriate, to execute agreed upon Plays.'"  (*Id.* at ¶ 22.)  The TSA has allegedly agreed to compensate the Commission for providing law enforcement officers at the RIC screening areas. (*Id.* at ¶ 24.)  Finally, Plaintiff notes that TSA Management Directive 100.4 requires TSA screeners to report evidence of crimes to a supervisor or law enforcement officials, including state and/or local law enforcement. (Pl.'s Fed. Opp'n 10 (citing Mem. Supp. Fed. Defs.' Mot. Ex. A).)[17]  This of course is closely analogous to a similar self-imposed duty shared by most citizens.

Plaintiff's allegations do not suggest any federal-state conspiracy or concerted action sufficient to state a claim against the Federal Defendants under § 1983.  That federal officials are required to notify state authorities of individuals suspected of posing a threat to airline safety is indicative of no more than "a cooperative federalism scheme,"

---

[16] In his First Amended Complaint, Plaintiff purports to quote the aforementioned Memorandum of Agreement. The Court, however, has not been provided a copy of the Memorandum Agreement.

[17] The Federal Defendants concede that they are statutorily required to "establish procedures for notifying . . . appropriate State and local law enforcement officials, and airport . . . security officers of the identity of individuals . . . suspected of posing[] a risk of air piracy or terrorism or a threat to airline or passenger safety." 49 U.S.C. § 114(h)(2).

which is insufficient to impute § 1983 liability to federal officials. *Strickland*, 123 F.3d at 868.

Moreover, Plaintiff alleges that the Commission Defendants agreed to help implement the Federal Defendants' procedures, not vice versa. Thus, as in *Olson* and as contemplated in *Ellis* and *Askew*, Plaintiff has not pleaded any factual basis for his contention that the Federal Defendants acted under color of state law. Plaintiff's § 1983 claims against the Federal Defendants in their official capacities must therefore be dismissed.

This brings the Court to the final issue: whether Plaintiff's constitutional claims against Smith and Jones in their individual capacities should be dismissed under the doctrine of qualified immunity.

*B.*

The doctrine of qualified immunity shields government officials exercising discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). Because "[q]ualified immunity is an entitlement not to stand trial or face the other burdens of litigation," questions of immunity should be resolved "at the earliest possible stage in litigation." *Saucier v. Katz*, 533 U.S. 194, 200–01, 121 S. Ct. 2151, 2156 (2001) (quotations omitted).

Whether an official is entitled to qualified immunity depends on two factors: (1) whether the facts, viewed in the light most favorable to the plaintiff, show that the

officer's conduct violated a constitutional right; and (2) whether that constitutional right was "clearly established" at the time of the violation.[18] *Id.* at 201, 121 S. Ct. at 2156. District courts may "exercise their sound discretion in deciding which of the two prongs . . . should be addressed first in light of the circumstances of the particular case at hand."[19] *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009).

i.

With respect to Plaintiff's equal protection claim, his Complaint is long on conclusions but short on underlying facts. "The Equal Protection Clause directs that 'all persons similarly circumstanced shall be treated alike.'" *Plyler v. Doe*, 457 U.S. 202, 216, 102 S. Ct. 2382, 2394 (1982) (quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S. Ct. 560, 562 (1920)). It does not, however, "require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner v. Texas*, 310 U.S. 141, 147, 60 S. Ct. 879, 882 (1940).

Plaintiff here alleges that Smith and Jones

> exceeded the authority granted by TSA Management Directive No. 100.4 . . . concerning the limited purpose of . . . searches conducted in airport screenings and thereby arbitrarily, capriciously and without rational basis, treated Plaintiff differently from other air travelers subject to the same screening process, by failing to follow applicable security Plays, and to prevent Plaintiff's unlawful arrest and false imprisonment without probable cause . . . .

(Pl.'s First Am. Compl. ¶ 111.)

---

[18] A right is "'clearly established' if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987)).

[19] Until 2009, district courts were required to analyze the factors sequentially. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009) (making discretionary the mandatory two-step approach set forth in *Saucier v. Katz*, 533 U.S. 194, 200–01, 121 S. Ct. 2151, 2156 (2001)).

Plaintiff has not, however, set forth any allegations concerning persons similarly circumstanced. Indeed, Plaintiff's complaint makes no reference to any other passengers who stripped off their clothes—much less passengers who began stripping down and continued to do so even after being told by a TSO that it was unnecessary—or otherwise launched a protest inside the screening area.[20] "[O]ther air travelers subject to the same screening process" (id.) who proceeded through the security screening area without needlessly disrobing are different in fact from Plaintiff. Because Plaintiff's Complaint is silent concerning the existence and/or treatment of similarly circumstanced passengers at RIC, his equal protection claim must be dismissed for failure to state a claim.

ii.

Plaintiff alleges that Smith and Jones, acting individually or in concert with Vann, Mason, Kandler, and Trice, "collaborated in causing [Plaintiff's] arrest and seizure, without probable cause to believe he had violated any law," and thereby violated Plaintiff's Fourth Amendment rights. (Pl.'s First Am. Compl. ¶ 99.)[21] In the Federal Defendants' view, "[t]he facts of this case present a novel question of the extent to which

---

[20] In his opposition to the Federal Defendants' Motion to Dismiss, "Plaintiff posits . . .that discovery will demonstrate . . . that he was treated differently than other similarly situated airline passengers." (Pl.'s Fed. Opp'n 22.) In support of this proposition, Plaintiff asserts that at least six "well-publicized 'strip protests'" occurred between late November 2010 and December 1, 2010. (Id.) These events, however, were not alleged in Plaintiff's Complaint, nor were the purported strip protesters similarly situated to Plaintiff. Rather, many of the events described in Plaintiff's opposition involved persons who entered the screening checkpoint scantily clad, but did not disrobe inside the sterile area. In any event, the purported "strip protests" to which Plaintiff refers concerned passengers at airports across the country on various days from November 23, 2010 to December 1, 2010. The relevant inquiry for this Court is how other screening-area protesters were treated at RIC on December 30, 2010.

[21] Plaintiff does not challenge the constitutionality of AIT scanning itself. The United States Court of Appeals for the District of Columbia recently held that "AIT screening does not violate the Fourth Amendment." *Elec. Privacy Info. Ctr., et al. v. U.S. Dep't of Homeland Sec.*, No. 10-1157, 2011 U.S. App. LEXIS 14503, at *23 (D.C. Cir. July 15, 2011).

the Fourth Amendment requires probable cause to detain an individual who enters a security screening checkpoint prior to boarding a commercial airline, *but who then fails to follow the direction of the screening TSO*." (Fed. Defs.' Reply 6 (emphasis added).)

The Federal Defendants focus heavily on this latter contention—that Plaintiff failed to follow the direction of a TSO in the screening area. (*See, e.g.*, Mem. Supp. Fed. Defs.' Mot. 14 ("[R]ather than proceed through the AIT machine as directed, plaintiff stood in the security line revealing the paraphrased language of the Fourth Amendment on his person."); Fed. Defs.' Reply 10 (contending that the TSOs acted reasonably in detaining Plaintiff because he "engaged in unpredictable behavior and . . . did not follow a direction to proceed through the AIT scanner").)

Plaintiff, however, alleges that he was ordered by Jones and/or another supervisory TSO "to stay where he was in front of the AIT unit," *not* to proceed through it. (Pl.'s First Am. Compl. ¶ 33.) He further alleges that he "[a]t all times . . . complied with the requests of agents and officers." (*Id.* at ¶ 65.) Regardless of whether the Federal Defendants may ultimately prove that Plaintiff failed to proceed through the AIT as directed, the Court must accept as true Plaintiff's allegations at this procedural stage. *Iqbal*, 129 S. Ct. at 1950.

Even assuming that Plaintiff followed the TSOs' instructions, however, Plaintiff's Complaint fails to state a Fourth Amendment claim against Smith and/or Jones. Plaintiff here alleges that he began stripping off his clothes inside the security screening area and continued to do so even after Smith advised that removal of clothing was unnecessary. (Pl.'s First Am. Compl. ¶¶ 31–32.) Plaintiff's counsel conceded at oral argument that

Plaintiff's behavior was bizarre, and that the TSOs were justified in summoning the RIC

Police for further inquiry. (Tr. 25:5–6, 37:22–23, 40:1.) This Court agrees. Given the

heightened security interest at airport security checkpoints, *see City of Indianapolis v.*

*Edmond*, 531 U.S. 32, 47–48, 121 S. Ct. 447, 457 (2000) (noting that the need for

searches and other "such measures to ensure public safety can be particularly acute" at

airports); *United States v. Herzbrun*, 723 F.2d 773, 776 (11th Cir. 1984) ("[A]irport

security checkpoints . . . are sui generis under the fourth amendment. Due to the intense

danger of air piracy . . . these areas, like international borders, are 'critical zones' in

which special fourth amendment considerations apply."), it was eminently reasonable for

Smith and Jones to seek assistance from the RIC police.

Despite this fact, Plaintiff maintains that Smith and Jones violated his Fourth

Amendment rights by causing his arrest without probable cause. In Plaintiff's view, the

alleged sequence of events—namely, Plaintiff's allegation that Vann and Mason

"immediately seized and handcuffed Plaintiff from behind" after being summoned by

Jones (Pl.'s First Am. Compl. ¶ 35)—supports a reasonable inference "that Smith and

Jones had asserted to police that Plaintiff had committed, or was about to commit a crime

. . . ." (Pl.'s Fed. Opp'n 17; *see also* Tr. 28:2–7).

Plaintiff's Complaint, however, is devoid of any facts suggesting that TSOs Smith

and/or Jones—neither of whom are law enforcement officers with the power of arrest—

made any such assertion or otherwise indicated to the RIC police that Plaintiff should be

arrested.[22] To the contrary, Plaintiff alleges that the command to arrest Plaintiff came from Mason, an RIC police officer. (Pl.'s First Am. Compl. ¶ 35 ("[U]pon information and belief, Defendant VANN, at the urging and direction of Defendant MASON, immediately seized and handcuffed Plaintiff . . . .").)

At bottom, Plaintiff concedes that it was reasonable for the TSOs to summon the RIC police, and nothing in the Complaint suggests a contrary inference. Moreover, Plaintiff explicitly alleges that an RIC police officer directed Plaintiff's arrest. Consequently, this Court cannot accept Plaintiff's extrapolated reasoning that the TSOs must have told the RIC police that Plaintiff was committing or was about to commit a crime or otherwise directed Plaintiff's arrest. Finding no Fourth Amendment violation by Smith or Jones, they are entitled to qualified immunity on the individual claim in Count One. Plaintiff's Count One claim against them must therefore be dismissed.

### iii.

This brings the Court to Plaintiff's final claim against Smith and Jones—that they "caused [Plaintiff's] seizure . . . because of the message conveyed by [his] silent, nonviolent expression of objection to the TSA's screening policies . . . and thereby engaged in content and/or viewpoint discrimination . . . ." (Pl.'s First Am. Compl. ¶ 105.)

The Federal Defendants contend that they are entitled to qualified immunity on this claim as well, because "the TSOs took the actions at issue because of plaintiff's

---

[22] Plaintiff's counsel conceded at oral argument that the Complaint "doesn't say directly that [Plaintiff's arrest] was at the instruction of the TSA." (Tr. 27:11–12.)

failure to follow TSO Smith's direction to proceed through the AIT, and not because of the message plaintiff had written on his chest." (Fed. Defs.' Reply 10–11.)  As discussed *supra* at Part V.B, this argument is based upon factual conclusions not reasonably inferred from the face of Plaintiff's Complaint, and which the Court cannot entertain at this procedural stage.  This Court must instead accept as true Plaintiff's allegation that he complied with all of the TSOs' instructions.

The question, then, is whether the TSOs in fact radioed for assistance because of the message Plaintiff sought to convey, as opposed to Plaintiff's admittedly bizarre behavior or because of some other reasonable restriction on First Amendment activity in the security screening area.[23]  The Fourth Circuit has recognized that:

> In instances where there is a material dispute over what the defendant did, and under the plaintiff's version of the events the defendant would have, but under the defendant's version he would not have, violated clearly established law, it may be that the qualified immunity question cannot be resolved without discovery.

*DiMeglio v. Haines*, 45 F.3d 790, 795 (4th Cir. 1995).  Accordingly, because Plaintiff's unrebutted claim facially states a cause of action, the question of qualified immunity must await further discovery.  *Cf. Swagler v. Neighoff*, 398 F. App'x 872, 877–78 (4th Cir. Oct. 18, 2010) (per curiam) (affirming district court's denial of qualified immunity in advance of discovery because issue of troopers' "subjective motivation" for action was

---

[23] Because airport terminals are not public fora, restrictions on speech there are need only "satisfy a standard of reasonableness." *Int'l Soc. For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 677, 112 S. Ct. 2701, 2704 (1992) (citing *United States v. Kokinda*, 497 U.S. 720, 110 S. Ct. 3115 (1990)).

"highly fact-dependent"). Accordingly, the Federal Defendants' Motion to Dismiss will be denied with respect to Count Two.[24]

**V.**

For the reasons stated above, Counts One, Two, and Three will be dismissed as to all defendants in their official capacities, and Counts One and Three will be dismissed as to Smith and Jones in their individual capacities.

An appropriate Order will accompany this Memorandum Opinion.

/s/
_____

Henry E. Hudson
United States District Judge

Date: **Aug. 30, 2011**
Richmond, VA

_____

[24] Of course, the Federal Defendants may renew their claim of qualified immunity following *discovery.*